REVISED MARCH 13, 2008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

February 21, 2008

Charles R. Fulbruge III
Clerk

No. 05-30963

ROCKY H CAIN

Plaintiff - Appellee

v.

TRANSOCEAN OFFSHORE USA, INC; SEDCO FOREX CORP

Defendants - Third Party Plaintiffs
- Appellants

v.

FONTANA CENTER LLC

Third Party Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before KING, GARZA, and OWEN, Circuit Judges.

KING, Circuit Judge:

This case requires us to consider the continued viability of our longstanding precedent holding that a watercraft under construction is not a "vessel in navigation" for purposes of the Jones Act. We hold that the Supreme Court's decision in Stewart v. Dutra Construction Co., 543 U.S. 481 (2005), has not effectively overruled that precedent because the decision did not concern or

address the point at which a vessel-to-be actually becomes a vessel. We therefore REVERSE the district court's denial of summary judgment and REMAND for further proceedings.

## I. Background

In 1996, Plaintiff-Appellee Rocky Cain began working as a driller on a semi-submersible drilling rig in the Gulf of Mexico for Sonat Offshore USA, Inc. Sonat later became part of Defendant-Appellant Transocean Offshore USA, Inc. On March 1, 2000, Transocean assigned Cain as a toolpusher to the "Cajun Construction Site" in Singapore. Cain worked in Singapore for approximately six months at the PPL Shipyard, where the M/V CAJUN EXPRESS was under construction. The CAJUN EXPRESS is a fifth-generation semi-submersible mobile offshore drilling rig designed to drill for oil and gas. Cain was expected to continue working on the CAJUN EXPRESS, or a sister rig, after construction was complete. Cain supervised a drill crew of seven men and was responsible for overseeing safety issues and commissioning the drilling equipment.

During the first half of 2000, the CAJUN EXPRESS underwent sea trials to ensure that the power generation and navigation systems worked and that the structure was watertight for transit. With tugboat assistance, the CAJUN EXPRESS was then towed with men and equipment aboard to Grand Isle, Louisiana. During the journey, workers continued to build the rig, and Cain continued to test equipment. Upon arriving in the Gulf of Mexico, the CAJUN EXPRESS was moored in a "floating shipyard" for completion of construction.

Although the rig was capable of self-propulsion, it was not fully capable of operating as a semi-submersible drilling rig. The necessary construction still included installation of vital pipe-handling equipment and "blisters," which are large steel boxes welded to the rig to increase its buoyancy. Daniel Haslam, a Transocean engineer, testified that when it arrived in the Gulf of Mexico the CAJUN EXPRESS could lay pipe only under limited weather conditions.

However, as a fifth generation semi-submersible unit, the most state of the art in the industry, the CAJUN EXPRESS was not designed to operate only under limited conditions. Haslam testified that no drilling contractor would have found the CAJUN EXPRESS fit for the purpose of drilling a deepwater well in the Gulf of Mexico.

On September 10, 2000, Cain was working on board the CAJUN EXPRESS. At that time, the blisters still had not been installed and the drilling systems had not been commissioned. Cain entered a warehouse located on board the rig to retrieve a part for a member of the drill crew, whereupon he struck his head on a low-hanging light fixture and was injured. A neurosurgeon later examined Cain and recommended that he undergo physical therapy. Cain received physical therapy and continued to work on board the CAJUN EXPRESS. In April or May 2001, the CAJUN EXPRESS was finally completed and began drilling operations in the Gulf of Mexico.

Cain continued to work as a toolpusher on the CAJUN EXPRESS but was subsequently diagnosed with a herniated disc. In September 2001, he discontinued work to undergo a cervical discectomy and fusion. Cain returned to work in December 2001, when Transocean assigned him to a "work hardening" program at the Fontana Center, a facility in Lafayette, Louisiana. While participating in the work hardening program, Cain allegedly experienced elevated blood pressure and suffered additional injuries.

Cain filed suit under the Jones Act, alleging that his injuries were the result of Transocean's negligence and the unseaworthiness of the CAJUN EXPRESS. He also alleged that Transocean was negligent in assigning him to the work hardening program. Transocean moved for summary judgment, arguing that Cain was not a Jones Act seaman at the time of his injury because the CAJUN EXPRESS was not yet a "vessel in navigation." The district court denied Transocean's motion, concluding that the Supreme Court's decision in

Stewart had overruled Fifth Circuit precedent concerning watercraft under construction. The district court held that the CAJUN EXPRESS was a vessel at the time of Cain's injury because under Stewart it was capable of transporting workers and equipment over water. This court granted Transocean's petition for leave to appeal the district court's denial of summary judgment. Fontana Center has not submitted a brief and has not raised any arguments on appeal.

## II. Discussion

We review the district court's denial of summary judgment de novo. Solano v. Gulf King 55, 212 F.3d 902, 905 (5th Cir. 2000). "Summary judgment is proper if the evidence shows the existence of no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Id.

Transocean argues on appeal that under our established precedent the CAJUN EXPRESS was not a vessel in navigation, and therefore Cain was not a Jones Act seaman, because the rig was still under construction at the time of Cain's injury. It further argues that the Supreme Court's decision in Stewart has effected no change on our prior case law. We agree with both contentions.

### A. "Seaman" status and our established precedent

We begin by describing two of the principal remedies available to injured workers who ply their trade in connection with the sea: the Jones Act and the Longshore Harbor Workers' Compensation Act ("LHWCA"). The two Acts are mutually exclusive compensation regimes. Becker v. Tidewater, Inc., 335 F.3d 376, 386 (5th Cir. 2003). The Jones Act permits a "seaman" to sue his employer for personal injuries suffered as a result of the employer's negligence. Park v. Stockstill Boat Rentals, Inc., 492 F.3d 600, 602–03 (5th Cir. 2007) (citing 46 U.S.C. § 30104(a)). Such an action allows for potentially unlimited damages and is in contrast to the generally prescribed remedial scheme available to maritime workers under the LHWCA. See Becker, 335 F.3d at 386–87. Congress did not define the term "seaman," however, and left the courts to decide which maritime

employees were covered by the Jones Act. Chandris, Inc. v. Latsis, 515 U.S. 347, 354 (1995).

The LHWCA provides the exclusive remedy to land-based workers who fall within its provisions. Id. at 355. It specifically excludes from its coverage "a master or member of a crew of any vessel." 33 U.S.C. § 902(3)(G). The Supreme Court has held this exclusion to be a refinement of the term "seaman" under the Jones Act. Chandris, 515 U.S. at 355–56. Thus, a key requirement for Jones Act coverage is actually found in the LHWCA. Id.

Under the Jones Act, a "seaman" is a term of art for an employee whose duties "contribut[e] to the function of the vessel or to the accomplishment of its mission" and who has "a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." Chandris, 515 U.S. at 368 (internal quotation marks and citation omitted); see also Garret v. Dean Shank Drilling Co., 799 F.2d 1007, 1009 (5th Cir. 1986) ("The worker is a seaman if he is assigned permanently to a vessel in navigation or performs a substantial part of his work on the vessel, contributing to the function of the vessel or to the accomplishment of its mission."). The existence of a "vessel" is thus crucial to determining seaman status under the Jones Act. Holmes v. Atl. Sounding Co., 437 F.3d 441, 446 (5th Cir. 2006).

We have long held that the Jones Act analysis requires a watercraft to be "in navigation," and we have drawn a distinction between completed crafts and crafts that are under construction. A maritime worker "assisting in the building and ultimate commissioning of a launched but uncompleted vessel floating or maneuvering in navigable waters is not a seaman within the meaning of the Jones Act, because his vessel is not yet an instrumentality of commerce—private or public—and is therefore not 'in navigation.'" Williams v. Avondale Shipyards, Inc., 452 F.2d 955, 958 (5th Cir. 1971). In Williams, we held that a launched

ship conducting sea trials was not "in navigation" because it was not yet being used for its intended purpose. Id.

Similarly, in Garret, we held that an offshore drilling rig was not a vessel in navigation because, at the time of the plaintiff's injury, the structure was still undergoing final construction to make it operational as an oil and gas drilling rig. 799 F.2d at 1009. We noted that the structure had never been engaged as an instrument of commerce and held that a "nonmerchant vessel is in navigation if it is engaged in its expected duties on navigable waters." Id.

In the instant case, the CAJUN EXPRESS was still under construction at the time of Cain's injury. Although the rig was capable of self-propulsion and had run some test pipe, it lacked vital equipment to make it fully operational as an oil and gas drilling rig. Indeed, as Daniel Haslam testified, no drilling contractor would have found the CAJUN EXPRESS fit to drill a deepwater well in the Gulf of Mexico. The CAJUN EXPRESS was not finally completed and placed into service until April or May 2001, after Cain was injured. Thus, under established Fifth Circuit precedent, the CAJUN EXPRESS was not a vessel in navigation and Cain was not a Jones Act seaman.

## B. Stewart

We now turn to the Supreme Court's decision in Stewart v. Dutra Construction Company. In Stewart, the Court addressed whether a dredge known as the SUPER SCOOP was a vessel under the LHWCA. 543 U.S. at 484. Although the case specifically concerned the LHWCA, we have recognized that Stewart's analysis of the term "vessel" applies equally to the LHWCA and to the Jones Act. Holmes, 437 F.3d at 448.

The SUPER SCOOP was a floating platform with a clamshell bucket suspended beneath the water used to remove silt from the ocean floor. Stewart, 543 U.S. at 484. The dredge was engaged in digging a trench beneath Boston Harbor as part of the "Big Dig" project. Id. It had limited means of self-

propulsion and was typically moved by tugboat, but it could move short distances by manipulating its anchors and cables. Id.

The First Circuit applied its test for vessel status found in DiGiovanni v. Traylor Bros., 959 F.2d 1119, 1123 (1st Cir. 1992) (en banc), which had held that "if a barge . . . or other float's purpose or primary business is not navigation or commerce, then workers assigned thereto for its shore enterprise are to be considered seamen only when it is in actual navigation or transit at the time of the plaintiff's injury." Id. at 485–86 (internal quotation marks omitted). The First Circuit held that the SUPER SCOOP was not a vessel because any navigation was incidental to the craft's primary function of construction. Id. at 486. It also found significant the dredge's stationary position at the time of the plaintiff's injury. Id.

The Supreme Court rejected the First Circuit's test for vessel status, concluding that although Congress did not define "vessel" in the LHWCA or the Jones Act, it had already defined "vessel" elsewhere at the time both acts were passed. Id. at 487–88. Specifically, under 1 U.S.C. § 3 (formerly § 3 of the Revised Statutes of 1873), a vessel "includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." Significantly, § 3 codified the meaning that the term "vessel" had acquired in general maritime law, and the Court noted the historic case law prior to the Jones Act and the LHWCA where courts had often used § 3's definition to conclude that dredges were vessels. Id. at 488–90 & n.5. The early case law showed that at the time the Jones Act and LHWCA were passed in the 1920s, a structure's status as a vessel depended on whether the structure was a means of transportation. Id. at 491.

Relying on § 3, the Court held that a vessel "is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." Id. at 497. In other words, the Court

7

rejected the First Circuit's two-pronged test, which had asked whether a craft was used primarily for transportation, and if not whether the craft was motionless or moving at the time of the plaintiff's injury. The Court looked only to whether the dredge could be used for transportation. Because the SUPER SCOOP was not only capable of transporting men and equipment but had actually done so, the Court found that the dredge was a vessel for purposes of the LHWCA. Id. at 495.

With respect to the requirement that a vessel be "in navigation," the Court clarified that the requirement was meant to show only that structures could lose their vessel status if they are withdrawn from the water for extended periods. Id. at 496. The "in navigation" requirement does not stand apart from § 3 and "is relevant to whether the craft is 'used, or capable of being used' for maritime transportation." Id. But "[t]he question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." Id.

## C. Stewart and vessels-to-be

The district court held that the CAJUN EXPRESS was a vessel under Stewart because not only was it capable of transportation but it had also transported workers and equipment from Singapore to the Gulf of Mexico. We disagree, however, that Stewart was intended to apply to watercraft that are still under construction. "[W]e cannot overrule the decision of a prior panel unless such overruling is unequivocally directed by controlling Supreme Court precedent." United States v. Zuniga-Salinas, 945 F.2d 1302, 1306 (5th Cir. 1991) (emphasis added). We conclude that our well-settled body of law in this area has not been effectively overruled.

The language in Stewart is admittedly broad, and we have recognized that the Court's decision significantly enlarges the types of unconventional and special purpose watercraft that now must be considered vessels that might not

have met the test before Stewart. See Holmes, 437 F.3d at 448. Stewart began, however, by framing the issue before it narrowly: "whether a dredge is a 'vessel' under [the LHWCA]." Stewart, 543 U.S. at 484. The Court decided that specific question, concluding that the First Circuit's focus on an existing craft's purpose and movement was inconsistent with the text of § 3 and the established meaning of "vessel" in general maritime law. We thus read Stewart's instruction that a craft is a vessel if it is capable of marine transportation in the context of that case to negate the First Circuit's test for an established structure.

Stewart examined an already-completed structure in use for its intended purpose. Stewart did not concern what to do with ships and other structures under construction, and so the Court did not address whether § 3's definition of vessel applies to incomplete structures that may be in a dry dock or a floating shipyard. In other words, Stewart did not consider whether an incomplete structure that "is not yet an instrumentality of commerce," Williams, 452 F.2d at 958, is a vessel in navigation. Rather, Stewart stressed that the "in navigation" requirement had nothing to do with locomotion and instead meant that "structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time." Stewart, 543 U.S. at 496. But for a structure to be able to lose its vessel status by being taken out of navigation, it must be equally true that a structure may not attain vessel status before it is ever put into "navigation."

Other courts have similarly concluded that an incomplete structure that has not been put into navigation as an instrument of commerce is not a vessel. See Caruso v. Sterling Yacht & Shipbuilders, Inc., 828 F.2d 14, 15–16 (11th Cir. 1987); Frankel v. Bethlehem-Fairfield Shipyard, 132 F.2d 634, 635–36 (4th Cir. 1942). Moreover, courts have historically spoken of navigation in tandem with commerce. See, e.g., The Robert W. Parsons, 191 U.S. 17, 31 (1903) (holding that a barge drawn by horses in the Erie Canal was a vessel because "[s]o long as the

vessel is engaged in commerce and navigation it is difficult to see how the jurisdiction of admiralty is affected by its means of propulsion"); Cope v. Vallette Dry-Dock Co., 119 U.S. 625, 627–28 (1887) (noting that "[a] ship or vessel, used for navigation and commerce, though lying at a wharf, and temporarily made fast thereto, as well as her furniture and cargo, are maritime subjects"); People's Ferry Co. of Boston v. Beers, 61 U.S. 393, 401 (1857) ("[T]he admiralty courts now exercise jurisdiction over rivers and inland waters, wherever navigation is or may be carried on, and extends to almost every description of vessel which may be employed in transporting our products to market. . . . The admiralty jurisdiction, in cases of contract, depends primarily upon the nature of the contract, and is limited to contracts, claims, and services, purely maritime, and touching rights and duties appertaining to commerce and navigation.").

That is not to say that only commercial structures may become vessels and implicate admiralty jurisdiction. See, e.g., Sisson v. Ruby, 497 U.S. 358, 363–67 (1990) (admiralty jurisdiction in tort requires inter alia that an incident have a potentially disruptive effect on maritime commerce and be substantially related to maritime activity, such as navigation, but the tortfeasor's activity may be commercial or noncommercial). Rather, our precedent is not inconsistent with the historical perspective that vessels under construction are treated differently from completed vessels. See The Francis McDonald, 254 U.S. 242, 243–44 (1920) (holding in a contract case that shipbuilding has been considered a nonmaritime activity, whether or not the incomplete ship has been launched). We have previously noted "the historical tradition that vessels under construction give rise to neither a maritime contract nor a maritime tort." Williams, 452 F.2d at 958 n.5; see also Alfred v. MV Margaret Lykes, 398 F.2d 684, 685 (5th Cir. 1968) (holding that an employee may not maintain a tort action against his employer for an injury sustained on a vessel that has been launched but not fully completed or commissioned). We do not read Stewart to change this body of law,

so that a structure under construction remains a non-vessel until it is complete and ready for duty upon the sea.

We further think the preclusion from vessel status of crafts still under construction serves several important goals and is consistent with the concern for avoiding uncertainties and possible oscillation in and out of Jones Act status. See Stewart, 543 U.S. at 495 (asking whether a watercraft is motionless or moving is the kind of "snapshot" test previously rejected and would impermissibly allow structures to oscillate back and forth between Jones Act coverage).

Our cases show that shipbuilders frequently begin the construction process in a shipyard at one location and then transport the partially completed craft to another location to finish the construction process. See, e.g., Garret, 799 F.2d at 1008 (barge hull transported by tug from shipyard in Houma, Louisiana, to Harvey, Louisiana, for completion of superstructure); Fredieu v. Rowan Cos., Inc., 738 F.2d 651, 652 (5th Cir. 1984) (ship partially constructed in Vicksburg, Mississippi, towed to Belle Chasse, Louisiana); Hollister v. Luke Constr. Co., 517 F.2d 920, 921 (5th Cir. 1975) (barge towed from Harvey, Louisiana, to Houma, Louisiana, to complete drilling rig). Along the way, hundreds of employees work to complete these partially-built structures. The CAJUN EXPRESS had over 200 men working on its completion. Stewart's application to these vessels-to-be could have the consequence of creating vessels out of partial structures and transforming many land-based ship construction workers into Jones Act seaman, at least while they work in the service of the ship. At a minimum, it would unnecessarily expand the labyrinth that has developed in the case law concerning seaman status by requiring fact-intensive inquiries in the district courts into the relationship between such workers and the intended vessel. Cf. Chandris, 515 U.S. at 356 ("We have made a labyrinth and got lost in it." (internal quotation marks and citation omitted)). Marine employers (and their

11

insurers) and employees, however, have an interest "in being able to predict who will be covered by the Jones Act . . . before a particular workday begins." Id. at 363.

That interest is hindered with respect to the construction of watercraft because there will be many points along the continuum of a ship's construction at which one could rationally argue it is "practically capable" of transportation and therefore a vessel. For example, a structure might become a vessel when it is merely capable of floatation but is still in dry dock; when it can be merely towed or pushed; when the navigation or propulsion systems are installed; when it has been inspected and commissioned; when it has been accepted for delivery; when a crew has been assigned; or when it is actually put to use. Our prior cases settle this uncertainty by asking whether the craft is complete. We continue to believe that "[f]or there to be a seaman, there must first be a ship," but "an incompleted vessel not yet delivered by the builder is not such a ship." Williams, 452 F.2d at 958.

The difficulty of applying Stewart to vessels under construction may be seen with respect to the CAJUN EXPRESS. The testimony showed that the rig lacked vital equipment for its operations and that no drilling contractor would have found the CAJUN EXPRESS acceptable for duty in the Gulf of Mexico. It strains reason to say that a craft upon the water that is under construction and is not fit for service is practically capable of transportation.

Moreover, mobile offshore drilling units like the CAJUN EXPRESS are subject to extensive Coast Guard regulations. See 46 C.F.R. §§ 107–09. Before operations begin the unit must receive an Original Certificate of Inspection certifying that it complies with all Coast Guard requirements, including regulations governing lifesaving and firefighting equipment. Id. §§ 107.211, 107.231. The record here shows that the Coast Guard performed an initial walk through of the CAJUN EXPRESS on August 31, 2000, as the first step in the

process of certification, but the rig was not put into service until April or May 2001. That the structure was not yet certified as operational and in compliance with all safety requirements casts doubt as to the practicality of its use as a means of transportation. To follow the district court's decision here also runs the risk of concluding that a vessel that may not be legally permitted to operate is nevertheless practically, rather than theoretically, capable of transportation.[1]

In short, although Stewart instructs that the "in navigation" requirement "is relevant to whether the craft is 'used, or capable of being used' for maritime transportation," 543 U.S. at 496, that instruction does not consider in the first instance when a vessel-to-be becomes a vessel. We view that issue as a separate question from whether an unconventional watercraft is a vessel. We therefore hold that Stewart does not require us to modify our precedent regarding the vessel status of incomplete watercraft. As such, the CAJUN EXPRESS was not a "vessel in navigation," and Cain was not a Jones Act seaman. Cain was thus not entitled to relief under the Jones Act for his September 10, 2000, injury.[2]

## III. Conclusion

The district court's denial of Transocean's motion for summary judgment is REVERSED and the case is REMANDED to the district court for further proceedings consistent with this opinion. Costs shall be borne by Cain.

---

[1] We do not hold that a watercraft that has not been certified by the Coast Guard can never be considered a vessel. See Holmes, 437 F.3d at 443–44 (holding that a barge containing a floating dormitory that had not been inspected by or registered with the Coast Guard was a vessel). We note only that the absence of certification when legally required should inform the evaluation of a structure's capability for transportation.

[2] We note that in the district court Cain argued that even if the CAJUN EXPRESS was not a vessel he was a Jones Act seaman based on his overall employment because he was a seaman before joining the CAJUN EXPRESS and his essential duties never changed. The district court did not reach this issue because it concluded that the CAJUN EXPRESS was a vessel. The parties have not briefed the issue to us, and we express no opinion on its merit. We merely note its existence and point out that it remains unresolved in the district court. Further, Cain's claims with respect to his alleged injuries at the Fontana Center are unresolved.

PRISCILLA R. OWEN, CIRCUIT JUDGE, DISSENTING:

This is a very difficult case, in my view. The panel's opinion sets forth cogent arguments as to why there should be a bright-line rule as to when a vessel under construction becomes a "vessel in navigation" for purposes of determining whether an injured worker was a "seaman" within the meaning of the Jones Act. However, the language used by the United States Supreme Court in Stewart v. Dutra Construction Company[3] is broad and seems to require us to conclude that the CAJUN EXPRESS is a contrivance that is capable of being used as a means of transportation on water since the CAJUN EXPRESS did in fact transport Cain and others across an ocean.

There are undoubtedly conceptual difficulties in applying the principle that a "contrivance" becomes a vessel in navigation when it is a "watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."[4] At some point prior to its actual commissioning, a "contrivance" under construction may become capable of maritime transportation in a physical and practical sense whether moored in the water or in dry dock. The uncertainties as to the hour or day the practical capability of maritime transportation occurs would seem a fertile source of contract and tort litigation and may lead to overlapping insurance arrangements, and unnecessary costs in obtaining that coverage. Additionally, a contrivance under construction may be moored for long periods of time while further construction continues after an initial voyage transported crew members on the seas, as was the case here.

In spite of the certainty and predictability that the panel's decision would bring in many if not most scenarios involving vessels under construction, the

---

[3] 543 U.S. 481 (2005).

[4] Id. at 497.

CAJUN EXPRESS appears to have all the attributes that the Supreme Court ascribed to a "vessel" in Stewart.  I therefore, very respectfully, dissent.