PAUL A. BONIN, Judge.
I,Dale Warmack appeals the trial court’s decision finding that general maritime law does not apply to his personal injury lawsuit. Finding that the Mississippi Queen was not a “vessel” at the time of Mr. Warmack’s injury, the trial judge concluded that Mr. Warmack could not satisfy the situs and nexus test for applying general maritime law and granted the motion for partial summary judgment filed by Direct Workforce, Inc.[1] and its insurer, Lexington Insurance Company.[2]
*807 On our de novo review of this partial summary judgment, we conclude that there is a genuine issue of material fact as to whether the Mississippi Queen was a “vessel” and that the resolution of her status as a vessel is, in this case, entrusted to the fact-finder after a trial on the merits. We also conclude that the test for applying general maritime law is, in this case, dependent upon the resolution of vessel status. We, therefore, reverse the partial summary judgment declaring that 12general maritime law does not apply to this case and remand this case to the district court for further proceedings.
We explain our holding in greater detail below.
I
In this Part we address the principles applicable to Direct Workforce’s motion for partial summary judgment on the issue of the applicability of general maritime law to Mr. Warmack’s claim.
“A summary judgment may be rendered dispositive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of summary judgment does not dispose of the entire case.” La. C.C.P. art. 966 E. “[A] motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted.” La. C.C.P. art. 966 C(l). “The burden of proof remains with the movant.” La. C.C.P. art. 966 C(2). “However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense.” Id. “Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.” Id.
Importantly, the party alleging admiralty jurisdiction or the application of the general maritime law bears the burden of proving it. See Denoux v. Vessel Management Services, Inc., 07-2143, p. 5 (La.5/21/08), 983 So.2d 84, 88. Here, [.that party is Mr. Warmack, not Direct Workforce. Consequently, Direct Workforce need only “point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense.” La. C.C.P. art. 966 C(2). Direct Workforce primarily sought to point out that an essential element of Mr. Warmack’s claim for application of the general maritime was an injury which occurred on a vessel but that the Mississippi Queen was not a vessel because it was “under construction.”
Mr. Warmack, under such circumstances, must “produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial.” La. C.C.P. art. 966 C(2). If he fails in producing such factual support, “there is no genuine issue of material fact.” Id. Mr. Warmack submitted evidence that the Mississippi Queen was not “under construction.”
After considering the factual submissions, the trial court concluded that there was no genuine issue of material fact that the Mississippi Queen was a vessel “under construction” and thus not a “vessel” for the purposes of general maritime law, citing to Cain v. Transocean Offshore USA, Inc., 518 F.3d 295, 301 (5th Cir.2008) (holding, “a structure under construction re *808 mains a non-vessel until is it is complete and ready for duty upon the sea”).
II
The Mississippi Queen was a steam-powered paddlewheel riverboat that started carrying passengers on leisure cruises in 1976. Sometime in either 2005 or 2006-the parties dispute the exact date — her cruises were discontinued so that repairs and renovations could be made to her. There is evidence that at first she was put in dry dock in Mobile, Alabama for perhaps up to two years. Later, in 14early 2007 she was towed to New Orleans and underwent repairs while floating on the Mississippi River at the Perry Street wharf.
Her new owners, Ambassadors International, Inc., a hotel conglomerate, decided on an even more extensive renovation project related to its brand’s image. Ambassadors intended to make the Mississippi Queen a “luxury product,” consistent with the company’s other riverboats and hotels. The owner’s intent was to have her back in service carrying passengers on river cruises after a few months, in time for the peak travel season.
Although the riverboat could have operated on the waterways in time for the 2007 season, management decided to continue the Mississippi Queen’s layover for the ongoing renovations. During this time, Mr. Warmack was hired to do repair work on the engines of the Mississippi Queen. And on July 11, 2007 he was injured when leaving the Mississippi Queen after completing the day’s shift.
In 2008, before the enhanced renovations were completed, Ambassadors abandoned the river cruising business, the Mississippi Queen never again carried passengers, and she was eventually sold for scrap in 2010.
Mr. Warmack originally filed suit against only Direct Workforce but later added Ambassadors as the owner of the vessel and alleged a claim under general maritime law.
Ill
“The word ‘vessel’ includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.” 1 U.S.C. § 3. “[I]t is generally accepted that ‘a vessel does not cease to be a vessel when she is not voyaging, but is at anchor, berthed, or at dockside,’ ... even when the vessel is undergoing repairs.” Chandris, Inc. v. Latsis, 515 U.S. 347, 373-374, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). (citations omitted). Once a ship is completed, and not before, she attains vessel status and becomes subject to admiralty jurisdiction. Cain, 518 F.3d at 301. This principle is similar to the status of contracts to build ships vis-a-vis contracts to repair ships: contracts to build ships are not governed by maritime law, whereas contracts to repair ships are. See The Francis McDonald, 254 U.S. 242, 244-245, 41 S.Ct. 65, 65 L.Ed. 245 (1920).
Once a vessel under construction attains vessel status, that vessel must remain “in navigation” in order to retain her status as vessel. Stewart v. Dutra Const. Co., 543 U.S. 481, 496, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005). The “in navigation” requirement does not stand apart from the § 3 definition such that a structure can be a “vessel” under § 3 and at the same time not be a “vessel in navigation” for the purposes of the Jones Act or the Long-shore and Harbor Workers’ Compensation Act. Id. A vessel need not actually be traversing navigable waters at the time of an injury to satisfy the “in navigation” requirement. Id. The requirement demonstrates that “structures may lose their *809 character as vessels if they have been withdrawn from the water for extended periods of time.” Id. The Supreme Court reasoned that a “ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail.” Id. “The question remains in all cases whether the watercraft’s use ‘as a means of transportation on water’ is a practical possibility or merely a theoretical one.” Id.
 A vessel remains “in navigation” while undergoing repairs, even if the vessel is in drydock for those repairs; however, the vessel’s repairs may be so extensive that the vessel can no longer be considered “in navigation.” Chandris, at 374, 115 S.Ct. 2172. “[V]essels undergoing repairs or spending a relatively short period of time in | f,drydock are still considered to be ‘in navigation’ whereas ships being transformed through ‘major’ overhauls or renovations are not.” Id.
The determination of whether a vessel was “in navigation” is a question of fact and should be left to the jury unless only one reasonable conclusion may be drawn from the facts. Id. at 373, 115 S.Ct. 2172.
The Mississippi Queen’s vessel status turns whether her repairs were so extensive that she had lost her vessel status at the time of Mr. Warmack’s injury.
The parties dispute the state of repair of the Mississippi Queen at the time of Mr. Warmack’s injuries. Because the degree of the repairs of a vessel determines whether that ship remains “in navigation,” and, in this case, there is not only one reasonable conclusion that may be drawn from these disputed facts, such a determination must be resolved by the fact-finder after a merits’ trial.
IV
The vessel status of the Mississippi Queen is the hinge issue in this case.
The United States Supreme Court case, Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995), lays out a test to determine whether maritime law is applicable to a given situation. Part of that test requires the finding of vessel status. Id. at 535, 115 S.Ct. 1043. The remainder of the Grubart test requires a tort claim to “satisfy conditions both of location and of connection with maritime activity.” Id. at 534, 115 S.Ct. 1043. “A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water.” Id. The connection test requires two determinations: “A court, first, must ‘assess the general features of the type of incident involved,’ ... to determine whether the incident has ‘a potentially disruptive impact on maritime commerce,’ ... Second, a court must determine |7whether ‘the general character’ of the ‘activity giving rise to the incident’ shows a ‘substantial relationship to traditional maritime activity.’” Id. (internal citations omitted.)
We find that the location test and both inquiries of the connection test are wholly dependent on the factual determination of whether the Mississippi Queen was a “vessel” at the time of Mr. Warmack’s injury. Only after the fact-finder determines the vessel status of the Mississippi Queen will the trial court be able to apply the Grubart location and connection tests. If the Mississippi Queen is found not to be a vessel, then Mr. Warmack’s injuries have a tenuous relationship to traditional maritime activity and are unlikely to affect maritime commerce; however, if the Mississippi Queen is found to be a vessel, then *810 Mr. Warmack’s injuries occurred while he was exiting a vessel, a well-established and traditional maritime activity, and the failure of vessel owners to provide a safe means of egress from vessels substantially affects maritime commerce. See Florida Fuels, Inc. v. Citgo Petroleum Corp., 6 F.3d 380, 332 (C.A.5 1993) (“the means of access between a dock and a vessel is considered an ‘appurtenance’ of the vessel”).
The Grubart location test requiring that the tort have occurred “on navigable water” is also dependent on a determination of the vessel status of the Mississippi Queen. The portion of the gangplank on which Mr. Warmaek was injured was over the Mississippi River; however, “[pjiers and docks [are] consistently deemed extensions of land.” Victory Carriers, Inc. v. Law, 404 U.S. 202, 206-207, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). “The gangplank has served as a rough dividing line between the state and maritime regimes.” Id. If the Mississippi Queen is not a vessel, she can be likened to a pier. But if she is a vessel, the tort will have occurred on the vessel because the gangway is an “appurtenance” of a vessel. See Florida Fuels, supra. “[Traditional maritime [slaw encompasses the gangway.” Thomey v. Weber Marine, 01-0153, p. 6 (La.App. 5 Cir. 5/30/01), 791 So.2d 135, 139 citing The Admiral Peoples, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633 (1935). Maritime locality was found in Thomey when the plaintiff slipped on a wooden pallet used as a makeshift gangway over river water that had risen into a parking lot. Thomey, pp. 7-8, at 140. In Ross v. Moak, 388 F.Supp. 461, 464 (M.D.La.1975), however, the tort did not occur on navigable waters because “[t]he wooden gangway onto or from which the plaintiff fell was over the river bank proper and did not extend over the water’s edge.”
DECREE
We reverse the granting of partial summary judgment and remand this matter to the trial court for further proceedings consistent with our holding.
REVERSED AND REMANDED

. Direct Workforce is the employer of Corey Martin. Mr. Martin had tossed a 60-pound bag of folded linens from one of the upper decks of the Mississippi Queen, striking Mr. Warmack who was exiting on the gangway. Mr. Warmack had been working aboard the Mississippi Queen; he was not a Jones Act seaman and not employed by her owner.

. Mr. Warmack also filed a motion for partial summary judgment asking the court to decide that general maritime law is applicable. A judgment denying a motion for partial summary judgment is interlocutory. See La. C.C.P. art. 968. Moreover, Mr. Warmack has not assigned as error in this appeal the denial of his motion. See People of the Living God v. Chantilly Corp., 251 La. 943, 207 So.2d 752, 753 (1968) (“when a judgment is rendered in the case which is appealable, the reviewing court can then consider the correctness of the prior interlocutory judgment.”)