**Reversed and Remanded and Memorandum Opinion filed December 15, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-15-00123-CV

## KELVIN GOLD, Appellant

## V.

## HELIX ENERGY SOLUTIONS GROUP, INC., Appellee

### On Appeal from the 270th District Court
### Harris County, Texas
### Trial Court Cause No. 2013-59134

### O P I N I O N

Appellant Kelvin Gold sued appellee Helix Energy Solutions Group, Inc. (Helix) after Gold was injured aboard a watercraft, the Helix 534. The trial court granted summary judgment to Helix on all of Gold's claims. The parties join issue on whether Helix established as a matter of law that Gold was not a Jones Act seaman—specifically, whether the Helix 534 was a "vessel in navigation." We reverse and remand.

# I.   SUMMARY JUDGMENT

In two issues, Gold contends the trial court erred by granting summary judgment to Helix because there is a fact issue about whether Gold was a Jones Act seaman, i.e., a member of a crew of a vessel.  First, we recite the standard of review.  Then, we review general principles for Jones Act seaman status.  Next, we review the record in the light most favorable to Gold.  Finally, we hold that Helix has failed to conclusively establish that Gold was not a Jones Act seaman.

## A.   Standard of Review

We review summary judgments de novo.  *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  A movant for a traditional summary judgment, such as Helix, must show that there is no genuine issue of material fact and an entitlement to judgment as a matter of law.  *See id.*  A defendant, such as Helix, is entitled to summary judgment if the evidence conclusively negates at least one essential element of the plaintiff's cause of action.  *See Little v. Tex. Dep't of Crim. Justice*, 148 S.W.3d 374, 381 (Tex. 2004).

Evidence is conclusive only if reasonable people could not differ in their conclusions.  *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005); *Loya v. Loya*, No. 14-14-00208-CV, — S.W.3d —, 2015 WL 4546562, at *3 (Tex. App.—Houston [14th Dist.] July 28, 2015, pet. filed).  We review the evidence in the light most favorable to the nonmovant, Gold, crediting evidence favorable to him if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not.  *See Mann Frankfort*, 289 S.W.3d at 848.  We indulge every reasonable inference in Gold's favor.  *See Kane v. Cameron Int'l Corp.*, 331 S.W.3d 145, 147 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

Whether a plaintiff such as Gold is a Jones Act seaman is a mixed question of law and fact. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995). Summary judgment on seaman status is appropriate when the facts and law will reasonably support only one conclusion. *See McDermott Int'l., Inc. v. Wilander*, 498 U.S. 337, 356 (1991). "The inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it." *Id.* "The question of whether an injured employee was a seaman at the time of his injury is normally a question for the trier of fact." *Willis v. Titan Contractors Corp.*, 625 S.W.2d 69, 73 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.); *accord Chandris*, 515 U.S. at 362 ("[T]he question of seaman status is normally for the factfinder to decide . . . ."); *Johnson v. Gulf Coast Contracting Servs., Inc.*, 746 S.W.2d 327, 328 (Tex. App.—Beaumont 1988, writ denied) ("Jones Act status is almost always a fact issue for the jury."); *see also Offshore Co. v. Robison*, 266 F.2d 769, 779–80 (5th Cir. 1959) (explaining that the term "vessel" has "such a wide range of meaning, under the Jones Act as interpreted in the courts, that, except in rare cases, only a jury or trier of facts can determine [its] application in the circumstances of a particular case").

**B.      Principles of Jones Act Seaman Status**

The Jones Act provides that a "seaman" injured in the course of employment may maintain an action for damages. *See* 46 U.S.C.A. § 688(a); *Chandris*, 515 U.S. at 354. Seamen are entitled to maintenance and cure when they are injured in the service of a ship. *See Chandris*, 515 U.S. at 354. A seaman's remedies grow out of "the status of the seaman and his peculiar relationship to the vessel, and as a feature of the maritime law compensating or offsetting the special hazards and disadvantages to which they who go down to sea in ships are subjected." *Id.* at 355 (quotation omitted).

3

The term "seaman" is not defined in the statute. *Id.* But, after enacting the Jones Act, Congress enacted the Longshore and Harbor Workers' Compensation Act (LHWCA), which provides the exclusive remedy for injured land-based maritime workers. *Id.* The LHWCA excludes from coverage a "master or member of a crew of any vessel." *Id.* (citing 33 U.S.C.A § 902(3)(G)). Courts have construed the term "seaman" in light of the exclusion appearing in the LHWCA because the remedies are mutually exclusive. *See id.* at 355–56. The LHWCA exclusion "is simply 'a refinement of the term "seaman" in the Jones Act.'" *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 488 (2005) (quoting *Wilander*, 498 U.S. at 347). Thus, a Jones Act seaman is a "master or member of a crew of any vessel." *See id.* at 356 (citing *Wilander*, 498 U.S. at 347 ("[I]t is odd but true that the key requirement for Jones Act coverage now appears in [the LHWCA].")).

The term "vessel," for purposes of the Jones Act and LHWCA, "includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C.A § 3; *see Stewart*, 543 U.S. at 491 ("[A]t the time Congress enacted the Jones Act and the LHWCA in the 1920's, it was settled that § 3 defined the term 'vessel' for purposes of those statutes."). Under this definition, the key question "remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." *Stewart*, 543 U.S. at 496. A structure falls within this definition when "a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735, 741 (2013). This "purpose-based" test permits "consideration only of objective evidence of a waterborne transportation purpose" as viewed by a "reasonable observer." *Id.* at 744–45 (noting that courts look at "the physical

4

attributes and behavior of the structure, as objective manifestations of any relevant purpose, and not the subjective intent of the owner"). The inquiry may involve factual issues for the jury. *See Stewart*, 543 U.S. at 496.

Although the United States Supreme Court has "sometimes spoken of the requirement that a vessel be 'in navigation,'" the *Stewart* Court clarified that the "in navigation" requirement does not stand "apart from § 3, such that a 'vessel' for purposes of § 3 might nevertheless not be a 'vessel in navigation' for purposes of the Jones Act." *Id.*[1] Rather, the "in navigation" element of the vessel status of a watercraft is "relevant to whether the craft is 'used, or capable of being used' for maritime transportation." *Id.* The "in navigation" aspect of vessel status is an acknowledgement that "structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time." *Id.*

Consistent with earlier "in navigation" case law, a "vessel does not cease to be a vessel when she is not voyaging, but is at anchor, berthed, or at dockside, even when the vessel is undergoing repairs." *Chandris*, 515 U.S. at 373–74 (citations and quotations omitted). A watercraft does not move in and out of Jones Act

---

[1] *See also Cain v. Transocean Offshore USA, Inc.*, 518 F.3d 295, 300 (5th Cir. 2008) ("The 'in navigation' requirement does not stand apart from § 3 . . . ."); *Bunch v. Canton Marine Towing Co.*, 419 F.3d 868, 871 (8th Cir. 2005) ("[I]in the context of the Jones Act, we look to the section 3 definition of 'vessel,' rather than attempting to discern additional meaning from the phrase 'in navigation.'"). *See generally* David W. Robertson, *How the Supreme Court's New Definition of "Vessel" Is Affecting Seaman Status, Admiralty Jurisdiction, and Other Areas of Maritime Law*, 39 J. Mar. L. & Com. 115, 124 (2008) ("[*Stewart*] has expanded the test for seaman status by making clear that there is no separate 'in navigation' requirement.").

We disagree with Helix's argument that the "in navigation" inquiry "remains a separate and distinct question." Helix quotes *Stewart* as holding that the § 3 definition of "vessel" "is significantly more inclusive than that used for evaluating seaman status under the Jones Act." 543 U.S. at 497. *Stewart*, however, was quoting the court of appeals' decision and immediately thereafter clarified, "The Court of Appeals' approach is no longer tenable." *Id.* In light of *Stewart* itself and the authorities cited above, we conclude that the "in navigation" requirement is "relevant" to a determination of whether a watercraft is a "vessel," but "in navigation" is not a separate element to be proven. *See id.* at 496.

coverage depending on whether it was actually moving at the time of the plaintiff's injury. *Stewart*, 543 U.S. at 495–96. Vessels "undergoing repairs or spending a relatively short period of time in drydock are still considered to be 'in navigation.'" *Chandris*, 515 U.S. at 374 (noting that six months was a "relatively short period of time for important repairs"); *see also Senko v. La Crosse Dredging Corp.*, 352 U.S. 370, 373 (1957) ("Even a transoceanic liner may be confined to berth for lengthy periods, and while there the ship is kept in repair by its 'crew.' There can be no doubt that a member of its crew would be covered by the Jones Act during this period, even though the ship was never in transit during his employment.").

"At some point, however, repairs become sufficiently significant that the vessel can no longer be considered in navigation." *Chandris*, 515 U.S. at 374. Thus, a vessel may cease to be a vessel for purposes of the Jones Act when it is being "transformed through 'major' overhauls or renovations." *Id.* This "underlying inquiry whether a vessel is or is not 'in navigation' for Jones Act purposes is a fact-intensive question that is normally for the jury and not the court to decide." *Id.* at 373.[2]

## C.    Summary Judgment Evidence

Helix and Gold submitted summary judgment evidence including an affidavit from Helix's representative Jason Shropshire, a transcript of Shropshire's deposition, a transcript of Gold's deposition, pictures of the Helix 534, a printout from Helix's website, and various Helix documents that refer to the Helix 534 as a

---

[2] In addition to proving the existence of a vessel under the "broad[]" definition in § 3, a plaintiff "seeking Jones Act seaman status must also prove that his duties contributed to the vessel's function or mission, and that his connection to the vessel was substantial both in nature and duration." *Stewart*, 543 U.S. at 494–95. Helix, however, does not challenge the existence of these other elements. As Helix argues on appeal, "summary judgment was granted on the grounds that the HELIX 534 was not a vessel 'in navigation,' as opposed to any other elements required to prove seaman status."

"vessel," Gold as a "seaman," and Helix as a "Jones Act employer." We review this evidence in the light most favorable to Gold.

### 1. *Purchase of the Helix 534 and Gold's Employment*

Helix purchased the Helix 534 for $85 million and took delivery of the ship in Singapore in August 2012. The Helix 534 was a 534-foot-long drill ship that Helix intended to convert to a well-intervention ship. The renovation began shortly after the ship arrived at the Jurong Shipyard in August 2012.

Helix hired Gold in November 2012 as an "able bodied seaman." According to Shropshire, Gold was hired "a few months before we first anticipated leaving the yard." Gold immediately began working 28-day hitches aboard the ship. And, Shropshire testified that had Gold not been injured, Gold's "ultimate job would have been offshore" in the Gulf of Mexico aboard the Helix 534.

Gold first noticed some pain in his neck and numbness in his hand while moving groceries aboard the Helix 534 shortly after he began working in December 2012. He reported to the ship's medic and ultimately saw his own doctor in January 2013 in Houston while he was off the Helix 534.[3] He was diagnosed with a pinched nerve and received a steroid injection. He was on hitch again in February, off in March, and on again in April. Gold reported to the Helix 534 medic again in April that he suffered more severe neck pain and tingling in his hand while moving a heavy beam. Gold saw a doctor in Singapore and was diagnosed with a "bulging disk or pinched nerve, herniated disk." He flew back to

---

[3] Helix flew Gold back and forth between Singapore and Houston while Gold was not on hitch.

Houston, and Helix paid Gold maintenance and cure until November 2013 when his employment ended.[4]

### 2. *Renovations of the Helix 534*

In a November 2012 article from Helix's website, Helix wrote that it anticipated the renovation project would be complete by mid-2013. Shropshire testified that Helix expected the repairs would be complete in as little as five or six months, or just a few months after Gold began working on the ship.

In the article, Helix wrote that its own vice president for commercial engineering was "[o]verseeing the conversion process." Shropshire later testified that the "Jurong Shipyard was in charge of the conversion work," which was mostly done by contractors. However, Shropshire also testified that the "ultimate control" of the Helix 534 would be under Helix's vice president of capital expenditures. The ship's crew and captain were not supervising the repairs.

Helix wrote on its website that the Helix 534 would "appear as she always has" after the conversion project. Despite increased capabilities for well intervention, "Her status as a Mobile Offshore Drilling Unit (MODU) will be maintained and her top hole drilling capability will remain."

By April 2013, the entire crew was aboard the Helix 534 working 28-day hitches.[5] Shropshire testified that the crew was brought on "towards the end of the

---

[4] Shropshire acknowledged that maintenance and cure are the types of benefits owed to seamen. In a letter dated October 1, 2013, Helix told Gold that Helix was his "Jones Act employer."

[5] The crew included a captain (a master/OIN), a chief mate, several senior and junior dynamic positioning officers, a bosun, a "bunch" of able bodied seamen, a couple of ordinary seamen, a chief engineer, a first engineer, a second engineer, a third engineer, a few ETOs, a couple of electricians, a couple of motormen, a couple of rig mechanics, a chief steward, some food-preparation employees (such as stewards, bakers, and cooks), a rig superintendant, a toolpusher, an assistant driller, crane operators, and others.

conversion to familiarize themselves with the vessel." Although the crew was "assisting with some of the work being done on the conversion," a lot of what the crew was doing was familiarizing itself with the Helix 534 because Helix was "not going to assign a green crew to a boat they've never been on and tell them to go to work."

Ultimately, Helix realized that the conversion project would take more time and cost more money than expected. The project took about twenty months and cost $115 million. Shropshire testified that the initial estimated cost had been less than $115 million. He was not certain if it was "80 million, 50 million, 60 million," although it would not have been as low as $15 million. The conversion took longer than anticipated because additional work was required, there was trouble getting some parts, and there were "labor issues."[6]

Shropshire testified that during Gold's employment, the Helix 534 lacked self-propulsion, although Shropshire did not know "one way or the other" whether the Helix 534 was practically capable of transportation on water "at all times" during the renovation. Gold testified that the ship had engines, but they were not working. Shropshire testified that the Helix 534 was dry-docked at the Jurong Shipyard. Gold testified similarly that the ship was in dry dock the entire time Gold was aboard the Helix 534, but he testified also that he was not aboard the Helix 534 when it was on blocks. According to Gold, the ship was "tied up" and

---

[6] In its motion for summary judgment, Helix included a list of about 30 items that were repaired "and/or" replaced or overhauled, citing to Shropshire's affidavit. Shropshire testified by his affidavit, "The repair and/or replacement list contained within Defendants' Motion for Summary Judgment is accurate . . . ." This is not proper summary judgment evidence of the repairs actually made to the Helix 534. *See Quanaim v. Frasco Restaurant & Catering*, 17 S.W.3d 30, 42 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("It is well settled that neither the motion for summary judgment, nor the response, even if sworn, is ever proper summary judgment proof."). Even if we were to consider the list as evidence, however, it is not dispositive of this appeal.

"always moored to a dockside" when he was aboard. In September 2013, the Helix 534 was dry-towed from Singapore to Galveston for further repairs.

When confronted with various documents in which Helix referred to the Helix 534 as a "vessel," Shropshire testified, "I think everybody referred to it as a vessel." Shropshire attached images to his affidavit, including pictures of the Helix 534 before and after the conversion and several pictures of the propeller of the ship while the ship was on blocks. The before and after pictures appear respectively as Exhibits A-5 and A-6:[7]



EXHIBIT
A-5

---

[7] *See Lozman*, 133 S. Ct. at 739 (holding that a floating house boat was not a vessel and referring to a photograph of the craft).



EXHIBIT A-6

## D. Analysis

The summary judgment evidence in this case is not conclusive. On the one hand, there is evidence that the Helix 534 was not merely "at anchor, docked for loading or unloading, or berthed for minor repairs"—when it would certainly remain a vessel. *See Stewart*, 543 U.S. at 494. On the other hand, there is evidence that the Helix 534 was not "permanently out of the water" with only a "remote possibility that [it] may one day sail again"—when it would certainly not be a vessel. *See id.* Shropshire testified that the company believed the repairs would be completed a few months after Gold was first injured on the ship, and Gold's injury occurred only a few months after the repairs began. The ship carried a full crew on 28-day hitches because there was a significant likelihood that the ship would sail again—it was anticipated to sail as early as five months after the repairs began.

11

Helix points to the lack of self-propulsion and the placement of the Helix 534 in a dry dock during Gold's employment, but these factors are not dispositive. *See Lozman*, 133 S. Ct. at 741 (although relevant, "lack of self-propulsion is not dispositive"); *Senko*, 352 U.S. at 373 (member of a crew may be covered by the Jones Act while the ship is berthed for lengthy repairs even though the ship was never in transit during the employee's tenure); *see also The Jefferson*, 215 U.S. 130, 142–43 (1909) (holding that admiralty courts retain jurisdiction over vessels undergoing repairs in dry docks; noting that a dry dock "differs from an ordinary dock only in the fact that it is smaller, and provided with machinery for pumping out the water in order that the vessel may be repaired" (quotation omitted)). Although Gold testified that the Helix 534 was in the dry dock when he was injured, he also testified that the ship was tied up, moored to a dockside, and not on blocks. A reasonable inference from this testimony is that the Helix 534 was in the dry dock, but the dock had not yet been emptied of water. The fact that the ship was moored the entire time Gold was onboard is also not dispositive. *See Senko*, 352 U.S. at 373 (member of a crew of a berthed ship being kept in repair for a "lengthy period[]" would "no doubt . . . be covered by the Jones Act during this period, even though the ship was never in transit during his employment").

Helix also stresses evidence that the repairs to the Helix 534 ultimately took about 20 months and cost $115 million. These may be relevant factors for assessing whether a vessel ceases to be a vessel because it is out of navigation for a major overhaul. *See McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d 567, 568–70 (9th Cir. 1992) (holding that the "hull of an oil drill ship" being converted into a "seagoing fish and crab processing ship" was not in navigation when the employee died seventeen months into the renovation project; noting that the hull was purchased for $451,000 and cost over $14 million to repair). But here there is also

evidence that Helix did not anticipate the repairs to be so lengthy and costly. In particular, the repairs were estimated initially to take a "relatively short period of time for important repairs"—as little as five months. *See Chandris*, 515 U.S. at 374 (six months). This evidence helps explain why Helix hired a full crew on 28-day hitches to learn the ship and contribute to its function.

Further, the reasons for the delayed repair schedule included "labor issues" and delays in obtaining needed parts. Thus, the length of time for the ultimate repair is not necessarily indicative of the ***scope*** of the project. *See McKinley*, 980 F.2d at 568 (two important factors are the "status of the vessel and the scope of work to be completed"). Helix also wrote on its website that the Helix 534 would maintain its drilling capabilities and would appear as it always had. This "conversion" could be characterized more as an upgrade compared to the project in *McKinley*, where the hull of a drill ship was entirely repurposed into a seafood processing ship. Related to the scope of the repair, in *McKinley* the cost of the major overhaul was more than thirty-one times the value of the original "hull" the company had purchased; here, however, the ultimate expenditure was about 1.35 times the value of the original "drill ship" Helix had purchased, and the initial estimate was even lower.

There is also evidence that "everybody" referred to the Helix 534 as a vessel; and it would be reasonable for an observer to do so in light of the pictures attached to Shropshire's affidavit, including Exhibit A-5 above. A reasonable observer, looking particularly to the physical characteristics of the Helix 534, could "consider it designed to a practical degree for carrying people or things over water." *See Lozman*, 133 S. Ct. at 741. The Helix 534 did not appear to be the type of watercraft that courts have held to be non-vessels as a matter of law. *See id.* (houseboat that had been moved several times by tow but was not designed for

13

transportation); *Stewart*, 543 U.S. at 493–94 (collecting cases; noting that a dry dock was not a vessel because it was a fixed structure and permanently moored for twenty years; a wharfboat was not a vessel because it had a permanent location and was secured by cables to land with water, electricity, and telephone lines running from land to the boat; a floating casino was not a vessel because it was moored to the shore in a semi-permanent or indefinite manner; and a floating processing plant was not a vessel because a large opening had been cut into the hull, rendering the craft incapable of moving over water).

Unlike the repairman injured in Helix's cited authority, *West v. United States*, Gold was not a land-based worker hired by an independent contractor to make a ship seaworthy after it had been totally deactivated for several years. *See* 361 U.S. 118, 120–22 (1959) (holding that ship owner made no warranty of seaworthiness to the land-based repairman). Similarly, Helix relies on *Wixom v. Boland Marine & Manufacturing Co.*, but the ship in that case had been undergoing repairs for nearly two years before the plaintiff's injury; the ship had no captain or crew; and the responsibility of the ship was vested entirely in the plaintiff's employer, which was a third-party contractor and not the owner of the ship. *See* 614 F.2d 956, 956–57 (5th Cir. 1980). The Helix 534, on the other hand, was only undergoing repairs for a few months at the time of Gold's initial injury in December 2012 (and repairs were not expected to take much longer); the ship had a full crew and a captain working 28-day hitches; and there is some evidence that Helix remained in ultimate control of the ship through several of its vice presidents.

Helix also relies on the Fifth Circuit's divided opinion in *Cain v. Transocean Offshore USA, Inc.*, where the court held that *Stewart* did not apply to the separate question of whether a structure under construction can ever be a

14

vessel.  *See* 518 F.3d 295, 303 (5th Cir. 2008).  That is, *Stewart*'s treatment of the "in navigation" requirement as merely "relevant" for determining vessel status did not apply to the question of "when a vessel-to-be *becomes* a vessel."  *Id.*  Here, however, Helix concedes that the Helix 534 was a traditional seagoing vessel before undergoing repairs at the Jurong Shipyard.[8]  To prevail on summary judgment, therefore, Helix had to establish conclusively that the Helix 534 was not a vessel in navigation at the time of Gold's injuries.  But Helix did not conclusively prove that the Helix was totally deactivated or out of service for an extended period of time before Gold's injury.  Accordingly, we think this issue should be decided by a fact finder under the totality of the evidence presented.  *See, e.g.*, *Chandris*, 515 U.S. at 373 ("[U]underlying inquiry whether a vessel is or is not 'in navigation' for Jones Act purposes is a fact-intensive question that is normally for the jury and not the court to decide.").

We hold that Helix failed to conclusively prove that the Helix 534 was not a vessel in navigation for purposes of Gold's claims.  A reasonable fact-finder could determine, based on the Helix 534's physical characteristics and activities, that the ship was designed to a practical degree for carrying people or things over water, and the Helix 534's use as a means of transportation on water was a practical possibility.

Gold's issues are sustained.

---

[8] Helix acknowledges in its brief that "the evidence in this case conclusively proves [the Helix 534] was a traditional seagoing vessel which, when in service, is designed to move under its own propulsion."

## II. CONCLUSION

Having sustained Gold's issues, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.


/s/     Sharon McCally
        Justice


Panel consists of Justices Jamison, McCally, and Wise.