980 F.2d 567
 1993 A.M.C. 305
 Linda McKINLEY, Personal Representative of the Estate of
Charles E. McKinley, deceased, Plaintiff-Appellant,
v.
ALL ALASKAN SEAFOODS, INC., Defendant-Appellee.
Linda McKINLEY, Personal Representative of the Estate of
Charles E. McKinley, deceased, Plaintiff-Appellee,
v.
ALL ALASKAN SEAFOODS, INC., Defendant-Appellant.
 Nos. 91-35637, 91-35792.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 17, 1992.
Decided Nov. 24, 1992.
 
 Edward Miner, Ross, Gingras & Miner, Anchorage, Alaska, for plaintiff-appellant/cross-appellee.
 Michael M. Holmes and Michael A. Barcott, Faulkner, Banfield, Doogan & Holmes, Seattle, Wash., for defendant-appellee/cross-appellant.
 Appeal from the United States District Court for the District of Alaska.
 Before: HUG, D.W. NELSON, and T.G. NELSON, Circuit Judges.
 T.G. NELSON, Circuit Judge:
 
 
 1
 Charles E. McKinley was killed in a fire aboard the hull of an oil drill ship undergoing conversion to a seagoing fish and crab processing ship. Linda McKinley ("McKinley"), Mr. McKinley's personal representative, sued for damages contending the ship was a vessel in navigation for purposes of the Jones Act. The district court granted summary judgment to the owners of the vessel and the personal representative appeals, contending genuine issues of material fact preclude summary judgment. We affirm.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 All Alaskan Sea Foods, Inc. ("All Alaskan") purchased the hull of an oil drill ship in New Orleans for $451,000 and spent $14,082,000 in the next seventeen months converting it to a seagoing fish and crab processing ship, known as the M/V All Alaskan.
 
 
 3
 After its purchase in July, 1987, the vessel underwent extensive reconstruction over the next fourteen months at various shipyards in the southern United States. Although All Alaskan conducted a portion of this work itself, most of it was completed by contractors.
 
 
 4
 At the end of September, 1988, with approximately $3,000,000 worth of work left to be finished, All Alaskan obtained the necessary certificates from the United States Coast Guard and the American Bureau of Shipping, thereby permitting the M/V All Alaskan to be moved by sea to Tacoma, Washington for completion of the work. The ship was moved to Tacoma for the sole purpose of continuing with the conversion work closer to All Alaskan's base of operations in Seattle. The vessel carried no cargo and engaged in no commerce on the trip. The trip to Tacoma took twenty-eight days and work on the ship continued during the journey. The vessel encountered substantial problems with its throttle controls, including inability to get underway in the Panama Canal. Throttle problems developed again off the west coast, but the vessel made it to Tacoma under its own power, although it could not go astern at the time it anchored.
 
 
 5
 All Alaskan had control of the vessel in Tacoma. Some of the work was done by its employees and some was completed by contractors. On December 28, 1988, the fire occurred which took Mr. McKinley's life. At that time, the vessel had undergone stability testing, but had not yet been granted a stability letter; in short, the M/V All Alaskan was not seaworthy at the time of Mr. McKinley's death.
 
 
 6
 McKinley sued for damages under the Jones Act, 46 U.S.C. app. § 688 (1982). The district court granted summary judgment for All Alaskan, holding the vessel was not in navigation as a matter of law at the time of the fire. This appeal followed.[1]
 
 STANDARD OF REVIEW
 
 7
 A grant of summary judgment is reviewed de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Summary judgment shall be considered proper if, viewing the evidence in the light most favorable to the nonmoving party, the movant is clearly entitled to judgment as a matter of law. Estate of Wenzel v. Seaward Marine Servs., Inc., 709 F.2d 1326 (9th Cir.1983).
 
 DISCUSSION
 
 8
 As the Supreme Court said in McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991), regarding the issue of seaman's status under the Jones Act:[2]
 
 
 9
 When the underlying facts are established, and the rule of law is undisputed, the issue is whether the facts meet the statutory standard.... [S]ummary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion.
 
 
 10
 498 U.S. at ----, 111 S.Ct. at 818. This is such a case.
 
 
 11
 The Jones Act represents an extension of the maritime negligence remedy to seamen. See McDermott Int'l, 498 U.S. at ----, 111 S.Ct. at 810-811 (the purpose of the Jones Act was to grant seamen the same rights as others to recover for negligence). In Wenzel, this court set out a three part test for determining "seaman" status under the Jones Act:
 
 
 12
 (1) the vessel on which the claimant was employed must be in navigation;
 
 
 13
 (2) the claimant must have a more or less permanent connection with the vessel; and
 
 
 14
 (3) the claimant must be aboard primarily to aid in navigation.[3]
 
 
 15
 Wenzel, 709 F.2d at 1327.
 
 
 16
 Only the first part of the Wenzel test needs to be addressed in this case. A vessel is in navigation when "engaged as an instrument of commerce and transportation on navigable waters." Caruso v. Sterling Yacht and Shipbuilders, Inc., 828 F.2d 14, 15 (11th Cir.1987). Caruso relied on the Fifth Circuit case of Williams v. Avondale Shipyards, Inc., 452 F.2d 955 (5th Cir.1971). Both Caruso and Williams involved newly constructed vessels, which had not yet undergone final sea trials. In fact, Williams was injured on a new Coast Guard cutter while on its final sea trials. On summary judgment in both cases, the district courts determined that the vessels were not in navigation.
 
 
 17
 McKinley contends that a jury issue is presented on the question of whether the M/V All Alaskan was in navigation. She cites Griffith v. Wheeling Pittsburgh Steel Corp., 521 F.2d 31, 37 (3rd Cir.1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976), and Waganer v. Sea-Land Service Inc., 486 F.2d 955 (5th Cir.1973), for the proposition that a ship that temporarily leaves commerce and enters a shipyard for routine or minor repairs is still in navigation.
 
 
 18
 We agree with this as a general proposition. However, there is no dispute in this case that the M/V All Alaskan was not in Tacoma for routine repairs. As the Fifth Circuit said in Waganer, "a primary touch-stone for distinguishing between major and minor repairs is the purpose for which the vessel has been idled." 486 F.2d at 958. Here, there is no question that the M/V All Alaskan was undergoing more than even "major" repair. The fourteen million dollar project amounted to a complete conversion of the ship. During the reconstruction period, it cannot be said that the ship was in navigation.
 
 
 19
 Major overhaul or refitting of a vessel will take the vessel out of navigation. In West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), the appellant, injured while employed by an independent contractor engaged in a complete overhaul of a "moth balled" World II liberty ship which was being recommissioned, sought to impose the maritime warranty of seaworthiness on the United States as owner of the ship. The Supreme Court rejected West's claim, noting that it was "evident that the sole purpose of the ship's being at Atlantic's Repair Dock ... was to make her seaworthy." Id. at 121, 80 S.Ct. at 192. The Court distinguished cases where the ships were in active maritime service, contrasting West's vessel which was undergoing major repairs and complete renovation. The Court held:
 
 
 20
 [T]he focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury.
 
 
 21
 361 U.S. at 122, 80 S.Ct. at 192.
 
 
 22
 West has been cited by the Fourth and Fifth Circuits in analyzing when a vessel is in navigation for purposes of the Jones Act.[4] Thus, the status of the vessel and the scope of work to be completed are factors to be considered when a vessel is undergoing renovations in port.
 
 
 23
 The Fifth Circuit in Wixom v. Boland Marine & Mfg. Co., Inc., 614 F.2d 956 (5th Cir.1980), held that "[i]n determining whether a ship under repair is still in navigation, the court should look at the extent and nature of the repair operations and who controls them." 614 F.2d at 957. The court determined on summary judgment that the vessel was not in navigation where the work performed included "major structural changes" and the costs exceeded twenty-five million dollars. Id.
 
 
 24
 It is clear that major renovations can take a ship out of navigation, even though its use before and after the work will be the same. See West, 361 U.S. 118, 80 S.Ct. 189. It is equally apparent that conversion of the vessel from one use to another would also take the ship out of navigation, if the change required extensive work. See Wixom, 614 F.2d at 957.
 
 
 25
 Although a summary listing of the work done to the M/V All Alaskan cannot fairly reflect the magnitude of the reconstruction, such a list provides insight into the scope of the project. The major items of work done included:
 
 
 26
 (1) stripping off virtually everything above the main deck;
 
 
 27
 (2) enclosing a 26' by 26' hole through the hull and decks which allowed the drilling shaft to be lowered for drilling;
 
 
 28
 (3) removing and adding bulkheads as necessary;(4) adding two anchors, an additional sewage system, pumps for potable water, salt water, and hydraulics, two auxiliary generators, two boilers and a water maker;
 
 
 29
 (5) adding a weather deck above the main deck, known as the fish house, 223' in length;
 
 
 30
 (6) raising the forecastle and the sides of the hull to enclose it;
 
 
 31
 (7) adding crew spaces to increase from 176 to 225 bunks;
 
 
 32
 (8) adding eight tanks, cookers and freezers for crab processing;
 
 
 33
 (9) installing two elevators and also four cranes in place of two that had been removed;
 
 
 34
 (10) pouring a concrete floor in the fish house;
 
 
 35
 (11) adding a mezzanine deck with crab butcher area;
 
 
 36
 (12) adding refrigeration equipment, together with insulation as required.
 
 
 37
 In addition to this work, a substantial amount of cleaning and painting was done, along with other miscellaneous work needed to convert the vessel to its new and different use.
 
 
 38
 McKinley argues that All Alaskan's control of the vessel distinguishes this case from West and Wixom, where the claims under the Jones Act were dismissed on the basis that the ships were not in the control of the final owners. The ship in West was controlled by the contractor, and the ship in Wixom was controlled by the manufacturing company. See 361 U.S. at 122, 80 S.Ct. at 192; 614 F.2d at 957. All Alaskan, by contrast, controlled its vessel while at Tacoma using its own forces for some of the work and engaging contractors for the remaining work. We hold that who had control of the vessel while undergoing conversion is not dispositive when the work is so extensive as to constitute conversion, as opposed to mere repair.
 
 
 39
 In Garrett v. Dean Shank Drilling Co., Inc., 799 F.2d 1007 (5th Cir.1986), the hull of a barge had been constructed by a shipyard and delivered to the owner for the addition of a superstructure, crew quarters and other fixtures and appurtenances necessary to make the vessel useful for its intended purpose as a drilling rig. Garrett was injured while employed by the owner during the completion of the work. The Fifth Circuit reversed a jury verdict finding Garrett to be a seaman under the Jones Act. In doing so, it rejected Garrett's contention that control by the owner distinguished the case from other cases holding uncompleted vessels to be not in navigation:
 
 
 40
 So long as a vessel has never been in navigation for its intended use, we do not think the determination of seaman status should turn on who is completing construction of the vessel. The pivotal question is whether the vessel has been placed in navigation for its intended purpose.
 
 
 41
 Id. at 1009.
 
 
 42
 The minimal value of the hull--$451,000--compared with the total cost of conversion of the M/V All Alaskan--$14,082,000--to a new use makes this case more analogous to new construction than repair or overhaul. In this circumstance, as in Dean Shank, the pivotal question is whether the M/V All Alaskan had been placed in commerce for its intended use. There is no question but that it had not.
 
 
 43
 The owner/contractor control factor might well be important where the work has been completed and the vessel is undergoing trials. If the owner had taken control of the ship from the contractor at that point, this would be some evidence that the ship was in navigation after being taken out of navigation. The fact that a contractor had control of the ship while undergoing repairs could also be a factor in distinguishing between major and minor repairs. Here, it is undisputed that millions of dollars of work remained to be done when the vessel reached Tacoma and that the vessel was not usable for its intended purpose at the time of the accident.[5]
 
 
 44
 A final argument of McKinley contends that the M/V All Alaskan was placed in navigation during the trip from the southern United States to Tacoma, Washington, and was not taken out of navigation upon reaching Tacoma. If we consider the status of the vessel at the time of the trip, and whether it had been placed to its intended use, this proposition is dubious at best. But even accepting her contention for purposes of discussion, the undisputed facts show the vessel was taken out of navigation while in Tacoma. Extensive modifications remained to be done, and the vessel was not usable for its intended purpose in the absence of the uncompleted work.
 
 
 45
 The M/V All Alaskan was undergoing a major conversion process, which included its move to Tacoma, Washington for completion. At the time of the fire, the vessel was not in navigation for purposes of the Jones Act. The district court's analysis was correct.
 
 
 46
 AFFIRMED.
 
 
 
 [1]
 All Alaskan cross-appealed, contending the district court erred in finding there was an issue of material fact concerning whether Mr. McKinley was hired to either assist in the conversion process or as a member of the crew. Our holding in this case that the district court correctly granted summary judgment on the navigation issue makes it unnecessary to address All Alaskan's cross-appeal
 
 
 [2]
 The Jones Act states in pertinent part:
 Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law.... [I]n case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law....
 46 U.S.C. app. § 688.
 
 
 [3]
 The third part of the test was rejected in McDermott Int'l, 498 U.S. at ----, 111 S.Ct. at 817
 
 
 [4]
 See Wixom v. Boland Marine & Mfg. Co., Inc., 614 F.2d 956 (5th Cir.1980); Warner v. Fish Meal Co., 548 F.2d 1193 (5th Cir.1977); Williams v. Avondale Shipyards, Inc., 452 F.2d 955 (5th Cir.1971); Hill v. Diamond, 311 F.2d 789 (4th Cir.1962)
 
 
 [5]
 The vessel had no stability letter, had not undergone sea trials, and the tops were off the potable water tanks and the double bottom fuel tanks, all of which were dry. Work was still being performed on the berths for the crew, the crab and fish processing equipment and the throttle controls