# IN THE SUPREME COURT OF TEXAS

══════════
No. 16-0075
══════════

HELIX ENERGY SOLUTIONS GROUP, INC., HELIX WELL OPS, INC., AND HELIX
OFFSHORE INTERNATIONAL, INC., PETITIONERS,

v.

KELVIN GOLD, RESPONDENT

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued January 11, 2017**

JUSTICE DEVINE delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE
WILLETT, JUSTICE GUZMAN, and JUSTICE BROWN joined.

JUSTICE JOHNSON filed a dissenting opinion, in which JUSTICE GREEN, JUSTICE LEHRMANN,
and JUSTICE BOYD joined.

The Jones Act provides a compensation scheme designed to mitigate the unique perils faced

by "seamen"—maritime workers with a substantial connection to a "vessel in navigation." *Chandris*

*v. Latsis*, 515 U.S. 347, 357 (1995). But without straightforward statutory definitions, and with

courts left to wade into a historically murky body of admiralty law, an array of vexing (and

inevitable) questions persists. What must a maritime worker do to bear an adequate connection to

a vessel? What is a vessel in the first place? And how do we know whether a vessel remains in

navigation when it exits the water for some time?  Answering these questions has proven to be, as the Supreme Court has charitably described the endeavor, "a difficult task." *Id.* at 358.

Despite recent clarifications on the subject, questions remain.  Be that as it may, we are not without enough clarity to guide our resolution of today's case.  That task requires us to determine whether a certain ship—taken out of service, subjected to a 20-month conversion process, and unable to engage in transportation during the entirety of the claimant's onboard employment—was "out of navigation" and thus outside the Jones Act.  We must determine also whether that question can be answered as a matter of law.

We answer both questions in the affirmative; the vessel was out of navigation as a matter of law.  We accordingly reverse the court of appeals, which found a fact question, and we reinstate the trial court's summary judgment in favor of the ship's owner.

## I. Background

In August 2012, Helix Energy Solutions Group purchased the HELIX 534 for $85,000,000. Prior to the purchase, the 534 was laid up in a shipyard.  And upon purchase, another vessel towed the 534 to the Jurong Shipyard in Singapore.  The 534 served her previous owner as a drill ship, a ship that drills wells.  But Helix purchased the 534 with plans to convert her into a well-intervention ship, a ship that services pre-existing offshore wells.

Work began upon the 534's arrival in Singapore.  Due to the extent of the conversion, Helix turned the 534 over to the control of contractors at the shipyard for completion of the bulk of the overhaul; though, Helix employees assisted with minor repairs.  The conversion involved, among other things, removing obsolete equipment, configuring and installing well-intervention equipment,

2

and overhauling the engines, thrusters, generators, and in-line propulsion equipment. The work done on the propulsive components rendered the 534 unable to navigate on her own for a substantial portion of the conversion process.

Though Helix initially expected the conversion to take five or six months (ending in mid 2013), unanticipated work, labor issues, and trouble procuring certain parts delayed the conversion. In September 2013, with work still to be done, Helix dry-towed[1] the 534 from Singapore to Galveston, Texas. In April 2014, 20 months after work began, the 534 entered well-intervention service for the first time under Helix's control. In total, the 20-month conversion cost $115,000,000, or roughly 135% of the 534's purchase price.

Today's dispute involves a particular Helix employee, Kelvin Gold. In November 2012, near the beginning of the project, Helix hired Gold as an "able bodied seaman," anticipating that he would serve as an offshore worker. Consequently, Gold's responsibility was to familiarize himself with the craft and to assist with the overhaul (painting, cleaning, taking inventory, etc.). Gold served two alternating 28-day hitches between early December 2012 and March 2013, along with a partial hitch in late April 2013. During the entire time Gold worked aboard the 534 (almost five months), the ship lacked the ability to navigate on her own due to the overhaul of her engines.

Gold reported injuries suffered aboard the 534 in December 2012 and in April 2013. Gold then stopped work aboard the 534 in April 2013, and his employment ceased in November 2013.

---

[1] Dry-towing involves placing a ship aboard a second ship and piggybacking the ship across the water.

Helix paid Gold "maintenance and cure" benefits, benefits available to an injured Jones Act seaman. But Helix terminated the payments after Gold allegedly failed to follow his doctor's orders.

Gold then sued Helix and Helix's affiliated entities for additional maintenance-and-cure benefits as well as actual and punitive damages. Gold claimed these remedies under the Jones Act as a "seaman" aboard a "vessel in navigation." Helix disagreed that the Jones Act applied to Gold's lawsuit and moved for summary judgment on the ground that the 534, while undergoing a major overhaul, was not a vessel in navigation. The trial court agreed and granted Helix's motion.

Gold appealed, and the court of appeals reversed. 482 S.W.3d 638, 650 (Tex. App.—Houston [14th Dist.] 2015). The court observed that Helix failed to "conclusively prove that the [534] was totally deactivated or out of service for an extended period of time before Gold's injury." *Id.* In turn, the court held, "A reasonable fact-finder could determine, based on the Helix 534's physical characteristics and activities, that the ship was designed to a practical degree for carrying people or things over water, and the Helix 534's use as a means of transportation on water was a practical possibility." *Id.*

We granted Helix's petition for review.

## II. Standard of Review

We review a trial court's grant of summary judgment de novo. *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). To prevail on a traditional motion for summary judgment, "a movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002)

4

(citing TEX. R. CIV. P. 166a(c)). When a movant conclusively negates an essential element of a cause of action, the movant is entitled to summary judgment on that claim. *Id.*

Furthermore, "we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.* But we cannot disregard "conclusive evidence"—that evidence upon which "reasonable people could not differ in their conclusions." *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). Typically, evidence is conclusive when "it concerns physical facts that cannot be denied" or "when a party admits it is true." *Id.* at 815.

Here, Helix bore the burden to conclusively negate the "seaman" element of Gold's Jones Act claim.

### III. The Jones Act

The Jones Act provides that,

> A seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

46 U.S.C. § 30104. The heightened legal protection under the Jones Act "grow[s] out of the status of the seaman and his peculiar relationship to the vessel, and as a feature of the maritime law compensating or offsetting the special hazards and disadvantages to which they who go down to sea in ships are subjected." *Chandris*, 515 U.S. at 355 (internal quotations and citations omitted).

So who qualifies as a seaman? The Jones Act does not define the term, which left courts to apply the "general maritime law [that existed] at the time the Jones Act was enacted." *Id.* Alas, the

traditional admiralty definition was unhelpful; a seaman was "a mariner of any degree, one who lives his life upon the sea." *Warner v. Goltra*, 293 U.S. 155, 157 (1934). Fortunately, Congress gave some context to the term in 1927 when it enacted the Longshore and Harbor Workers' Compensation Act (LHWCA), which provides coverage to "land-based maritime workers but which also explicitly excludes from its coverage 'a master or member of a crew of any vessel.'" *Chandris*, 515 U.S. at 355 (quoting 44 Stat. (part 2) 1424, as amended, 33 U.S.C. § 902(3)(G)). In effect, Congress's creation of "mutually exclusive" compensation regimes meant that the LHWCA's exclusion actually helped to define the term "seaman" in the Jones Act—i.e., a Jones Act seaman must be a member of a crew of a vessel. *See McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 347 (1991) (explaining the relationship between the acts). But not just any vessel will do. The Supreme Court later clarified that a Jones Act seaman must bear a satisfactory connection to a "vessel in navigation." *Roper v. United States*, 368 U.S. 20, 22–23 (1961).

After decades of navigating a labyrinth of definitions and admiralty buzzwords, the Supreme Court identified two basic components of Jones Act coverage: the maritime worker must (1) be a crew member who does the "ship's work" and (2) have a substantial connection to a vessel in navigation. *Chandris*, 515 U.S. at 368. But, like most aspects of admiralty law, there is more to this standard than meets the eye.

## A.     Crew Member Who Does the Ship's Work

The Supreme Court has clarified that the worker's duties must "contribut[e] to the function of a vessel or to the accomplishment of its mission." *Wilander*, 498 U.S. at 355. The requirement thus looks to the nature of the person—what does he or she do in relation to the watercraft?

6

Here, Gold was employed in anticipation of being an offshore worker, and his duties plainly "contribute[d] to the function" of the 534. *Chandris*, 515 U.S. at 368. Helix does not contend that it is Gold's job description that renders him outside Jones Act coverage—Helix says simply that the 534's conversion took her out of navigation. The present dispute therefore does not hinge on Gold's particular duties while aboard the 534.

**B.      Substantial Connection with a Vessel In Navigation**

A Jones Act seaman must bear a requisite connection—one that is "substantial in terms of both its duration and its nature"—to a vessel in navigation. *Id.* Whether the 534 was a vessel in navigation is implicated directly by Helix's motion for summary judgment.

What is a vessel in navigation? Again, Congress provided some helpful context for the phrase. In Section 3 of the Rules of Construction Act, Congress defined the word "vessel" to mean "every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. Drawing on that definition and decades of caselaw, the Supreme Court emphasized in *Stewart v. Dutra Construction Co.* that the vessel-in-navigation requirement asks "whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one." 543 U.S. 481, 496 (2005) (internal quotations and citations omitted). And in making that determination, the Supreme Court recently stressed the importance of considering objective evidence of the status and characteristics of the watercraft in lieu of subjective evidence of the owner's intent. *Lozman v. City of Riviera*, 568 U.S. 115, 145 (2008).

7

Though the vessel-in-navigation issue is couched as a singular requirement, two distinct situations can arise. This distinction plays an important role in conceptualizing the crux of today's dispute and in deciding its ultimate outcome.

### 1. The Design of the Structure

The first potential question under the in-navigation framework involves the type of structure—is it designed to function in the manner of a seafaring "vessel," or does it merely happen to float? A classic example of this dilemma is *Lozman*, in which the Court analyzed whether a 60-foot by 12-foot floating home was a vessel. 568 U.S. at 118. The Court concluded the home was not a vessel, reasoning that "[t]he home has no other feature that might suggest a design to transport over water anything other than its own furnishings and related personal effects. In a word, we can find nothing about the home that could lead a reasonable observer to consider it designed to a practical degree for 'transportation on water.'" *Id.* at 122. Numerous cases involve similar design-based questions. *See, e.g.*, *Martin v. Boyd Gaming Corp.*, 374 F.3d 375, 377 (5th Cir. 2004) (a moored floating casino served no transportation function and was not a vessel in navigation); *Billiot v. Great Lakes Dredge & Dock Co.*, Civ. A. No. 92-2813, 1993 WL 322906, at *3 (E.D. La. Jun. 29, 1993) (a barge configured solely for use as a work platform was not a vessel in navigation).

The conversion of the 534 presents no such controversy. Prior to Helix's purchase of the 534, the craft functioned as a seafaring vessel. She transported maritime workers in the course of her well-drilling role—precisely the type of function performed by a Jones Act vessel. And the 534's conversion, though it gave her an added well-servicing capacity, did nothing to change her

8

transportation-facilitating design.  In plain English, the 534 was, is, and (unless transformed into something like a stationary casino) will be a boat.  Helix does not suggest otherwise.

## 2. Major Overhauls

Different entirely, though also under the vessel-in-navigation umbrella, is the principle that "major renovations can take a ship out of navigation, even though its use before and after the work will be the same."  *Chandris*, 515 U.S. at 374 (citing *McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d 567, 570 (9th Cir. 1992)).  That is, even when a structure is unquestionably designed to engage in maritime transportation, an extended overhaul can remove the structure from navigation.  *McKinley*, 980 F.2d at 570.  This rule is deeply ingrained in admiralty, dating back to *West v. United States*, in which the Supreme Court held as a matter of law[2] that a vessel withdrawn from service and undergoing a major overhaul was not in navigation.  *See* 361 U.S. 118, 121–22 (1959).  Lower courts have likewise acknowledged and applied the rule.  *See, e.g.*, *Wixom v. Boland Marine & Man. Co.*, 614 F.2d 956, 957 (5th Cir. 1980) (a three year, $25,000,000 conversion that included major structural changes such that the ship's engine and propellers were inoperable for "at least some of the time" rendered the ship out of navigation).

Yet, at the same time, "a vessel does not cease to be a vessel when she is not voyaging, but is at anchor, berthed, or dockside," even when she "is taken to a drydock or shipyard to undergo repairs in preparation to making another trip."  *Chandris*, 515 U.S. at 373–74 (citations and internal

---

[2] The Supreme Court did not make explicit in *West* that its decision was as a matter of law.  However, tracing the procedural history of the case reveals that *West* affirmed a district court's matter-of-law finding.  *See West v. United States*, 143 F. Supp. 473, 480 (E.D. Pa. 1956) (declaring that the ship was not a seaworthy vessel); *see also* David W. Robertson, *How the Supreme Court's New Definition of "Vessel" is Affecting Seaman Status, Admiralty Jurisdiction, and Other Areas of Maritime Law*, 39 J. Mar. L. & Com. 115, 154 n.182 (2008) (chronicling *West*'s procedural maze).

quotations omitted).  Lower courts have echoed this sentiment; temporary and routine repairs do not take otherwise seaworthy vessels out of navigation.  *See, e.g.*, *Romero v. Cajun Stabilizing Boats, Inc.*, 307 Fed. App'x 849, 851 (5th Cir. 2009) (holding that a vessel that was dry-docked for several weeks for routine repairs remained in navigation as a matter of law)*.*

The dichotomy, phrased in the Court's language from *West*, is between ordinary, expected "ship's work" and "complete overhaul[s]."  361 U.S. at 122; *see also Stewart*, 543 U.S. at 494 (explaining that a vessel does not move out of Jones Act coverage when "berthed for minor repairs"). Of course, that distinction is a matter of "degree"—at some point "repairs become sufficiently significant that the vessel can no longer be considered in navigation."  *Chandris*, 515 U.S. at 374. And in evaluating where a ship falls on the spectrum, the Supreme Court enshrined a touchstone: "the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done."  *Id.* (citing *West*, 361 U.S. at 122).  Over the years, courts have utilized various proxies in evaluating the extent of overhauls, but no exhaustive list or uniform approach has emerged.

It bears emphasis too that the distinction between routine, temporary repairs and major overhauls is not an arbitrary one.  The distinction makes good sense in the greater context of the Jones Act, which codified "a feature of maritime law compensating or offsetting the special hazards and disadvantages to which they who go down to sea in ships are subjected."  *Id.* at 355 (citations omitted).  When a maritime worker suffers an injury during a routine repair, we can confidently attribute the worker's injury to a risk associated with "go[ing] down to sea in ships."  *Id.*  After all, every seagoing ship (and thus every seaman) experiences routine repairs from time to time.  But a

10

maritime worker whose only connection is to a ship undergoing a nonroutine, major overhaul incurs risks more akin to those faced by land-based construction workers—a danger better addressed by the Longshore and Harbor Workers' Compensation Act. *See* 33 U.S.C. § 902(3) (covering those non-seamen engaged in maritime employment, such as longshoremen "and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker").

Finally, we must address the impact of *Stewart*, one of the Supreme Court's most recent forays into in-navigation territory. *Stewart* dealt with both sides of the in-navigation coin, answering first a design-based question: whether a barge was designed to a practical degree to facilitate maritime transportation. But *Stewart* dealt also with repairs: whether a temporary repair took the barge out of navigation. With respect to the repair question, *Stewart* did not effectuate a paradigm shift from the concept that major overhauls take a ship out of navigation; in fact, the Court reaffirmed *West* (the classic overhaul case) and the idea that "structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time." *Stewart*, 543 U.S. at 496 (citing *West*, 361 U.S. at 118).

But *Stewart* did recognize that a major overhaul must carry with it a certain effect to take a vessel out of navigation. By broadly stating that the in-navigation requirement "is relevant to whether the craft is 'used or capable of being used' for maritime transportation," and by stressing that the vessel in question was not rendered practically incapable of maritime transport by its temporary repair, the Supreme Court appears to have clarified that only overhauls that render ships practically incapable of transportation will take those ships out of navigation. *Stewart*, 543 U.S. at 496.

11

Practical versus theoretical capability to transport over water is, to say the least, a rather nebulous standard. How exactly such a standard should be applied to a variety of conceivable circumstances remains to be seen. Yet by reaffirming *West*, we can at least discern what satisfies *Stewart*'s standard in the context of a major overhaul. In *West*, the out-of-service ship, while subjected to a substantial renovation, was incapable of transportation on its own and instead had to be towed to the shipyard for construction work. 361 U.S. at 121–22. Therefore, *Stewart*—at a minimum[3]—sanctioned out-of-navigation treatment for those major overhauls that render ships incapable of self-transportation.

## C.     The Propriety of Summary Judgment Under the Jones Act

Before diving into the court of appeals' analysis and the summary-judgment evidence, we pause to consider the circumstances in which judgment as a matter of law is appropriate, if ever, on the threshold issue of seaman status. A plaintiff's status as a seaman under the Jones Act is a mixed question of law and fact. *Chandris*, 515 U.S. at 369. More specifically, "whether a vessel is or is not 'in navigation' for Jones Act purposes is a fact-intensive question that is normally for the jury and not the court to decide." *Id.* at 373. Gold stressed this admonition throughout his briefing, and the court of appeals did the same, citing the oft-repeated phrase several times in its opinion. *See* 482

---

[3] We need not hypothesize about whether *Stewart* makes it a necessary (as opposed to merely a sufficient) condition to out-of-navigation status that an overhaul render a ship incapable of transportation on her own. As discussed more fully below, the 534's overhaul did, in fact, render her incapable of self-transportation during the entirety of Gold's onboard employment.

12

S.W.3d at 642–44, 650. Yet, at the same time, the Supreme Court[4] and lower courts[5] routinely decide the in-navigation question in major-overhaul cases without resorting to a jury. How can these cases be compatible with the Supreme Court's cautionary words? The answer: Despite the admonishment, the Supreme Court (like this Court) adheres to the time-honored maxim that we may remove an issue from the jury's consideration "where the facts and the law will reasonably support only one conclusion." *Chandris*, 515 U.S. at 373 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)); *cf. City of Keller*, 168 S.W.3d at 814 (explaining that "[b]y definition, [conclusive] evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it").

*Stewart* is particularly instructive. There the Supreme Court delivered its usual caution that the in-navigation question "may involve factual issues for the jury." 543 U.S. at 496. But immediately thereafter, the Court concluded, "[H]ere no relevant facts were in dispute . . . the [barge] was only temporarily stationary while Stewart and others were repairing the scow; the [barge] had not been taken out of service, permanently anchored, or otherwise rendered practically incapable of maritime transport." *Id.* Put differently, the barge in *Stewart* fell decidedly on the routine-repair side

---

[4] *See, e.g.*, *Stewart*, 543 U.S. at 496 (finding a barge undergoing minor repairs to be in navigation as a matter of law); *West*, 361 U.S. at 122 (finding an out-of-service ship subjected to a major overhaul out of navigation as a matter of law).

[5] See, e.g., *McKinley*, 980 F.2d at 572 (holding that a vessel undergoing a significant conversion was not in navigation as a matter of law); *Romero*, 307 F. App'x at 851 (holding that a vessel that was dry-docked for several weeks for routine repairs remained in navigation as a matter of law); *Wixom*, 614 F.2d at 957 (holding that a three-year conversion that included major structural changes rendered the ship out of navigation as a matter of law); *Saunders v. Gulf Coast Fabrication, Inc.*, No. 1:02CV42WJG-JMR, 2006 WL 1766722, at *4 (S.D. Miss. Jun. 23, 2006) (holding a vessel was not in navigation when uncontested affidavits established that it was "incomplete, under construction and sitting ashore supported by concrete and wood supports").

of the spectrum, and, with no factual disputes to send to the jury, the Court displayed no hesitation in deciding the question as a matter of law. So long as (1) the relevant facts are not in dispute in the present case and (2) the 534 falls decidedly on the major-overhaul side of the spectrum, neither should we.

## IV. Analysis

Helix first takes issue with three aspects of the court of appeals' decision: (1) the court's reliance on certain subjective evidence of vessel status; (2) the court's requirement that an out-of-navigation ship be "'permanently out of the water' with only a 'remote possibility that [she] may one day sail again'" and (3) the court's requirement that a ship be "totally deactivated or out of service for an extended period of time" before the claimant's injury. 482 S.W.3d at 648, 650. And second, Helix argues that the undisputed evidence proves conclusively that the 534 was out of navigation for purposes of Gold's employment. We take the issues in turn.

### A. Objective Versus Subjective Evidence

The court of appeals stressed certain evidence in identifying an issue worthy of jury determination, including that "'everybody' referred to the Helix 534 as a vessel." *Id.* at 649. Based on this collective label, the court concluded that a "reasonable observer, looking particularly to the physical characteristics of the Helix 534, could 'consider it designed to a practical degree for carrying people or things over water.'" *Id.* (citing *Lozman*, 568 U.S. at 121). Gold likewise points to various communications between Helix and Gold that refer to Gold as an "able bodied seaman." Gold argues these references prove that he was, in fact, a seaman under the Jones Act. Helix counters that reliance on these labels is improper.

14

Reliance on these subjective labels presents two problems. First, as Helix suggests, the subjective labels of "vessel" and "able bodied seaman" are the type of evidence the Supreme Court cast aside in *Lozman*, favoring "objective evidence" in lieu of "subjective elements, such as [the] owner's intent." 568 U.S. at 127–28. A court must look to the "physical attributes" of a craft "as objective manifestations," *id.*, and (with respect to an overhaul case like this one) "the status of the ship, the pattern of the repairs, and the extensive nature of the work to be done." *Chandris*, 515 U.S. at 374.

But there is a more fundamental problem with denying summary judgment based on these labels. Even if these labels were probative, they would be probative only of issues ancillary to the true dispute in this case—the effect of the 534's conversion. Let us assume that a collective reference to the 534 as a "vessel" did support the court of appeals' conclusion that the 534 was "designed to a practical degree to carrying people or things over water." 482 S.W.3d at 649 (citation omitted). That conclusion is only a piece of the puzzle—a structure has to be designed as a seafaring craft to qualify for vessel status in the first instance. *See Lozman*, 568 U.S. at 122. But the inescapable conclusion that the 534 is a boat says nothing about whether the 534 was out of navigation during her overhaul. *See McKinley*, 980 F.2d at 570 ("It is clear that major renovations can take a ship out of navigation, even though its use before and after the work will be the same.").

Nor are Helix's references to Gold as an "able-bodied seaman" probative of the dispositive issue. No doubt, Gold was hired to do a seaman's work. But in order to be a "seaman" under the Jones Act, one must possess more than the right job description; one must belong to a vessel, and that vessel must be in navigation. *Chandris*, 515 U.S. at 368. If, at the end of the day, Helix

15

conclusively negated the "in-navigation" piece of the equation, the other variables become immaterial.

**B.      Permanency of the Ship's Time Out of Water**

In finding a lack of conclusive evidence, the court of appeals cited *Stewart* and delineated what it thought to be the  dichotomy between minor repairs and major overhauls:

> On the one hand, there is evidence that the Helix 534 was not merely at anchor, docked for loading or unloading, or berthed for minor repairs—when it would certainly remain a vessel.  On the other hand, there is evidence that the Helix 534 was not permanently out of the water with only a remote possibility that [it] may one day sail again—when it would certainly not be a vessel.

482 S.W.3d 647–48 (quotations and citations omitted).  But Helix argues that the court misread *Stewart* and in effect tied in-navigation status to whether a ship is expected to sail again.  Helix maintains that the court's standard cannot comport with the well-established rule that major overhauls take ships out of navigation.  After all, do not a vast majority of overhauls occur for the very purpose of returning a ship to seaworthiness?

We agree with Helix that the court of appeals misconstrued *Stewart* and thereby skewed the threshold for summary judgment.  In discussing the requirement that a ship be "used, or capable of being used" for maritime transportation in order to be in navigation, the *Stewart* Court differentiated between the practical and the theoretical:

> A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again.

16

543 U.S. at 494. The *Stewart* Court thus used the "ships taken permanently out of water" scenario as one of several hyperbolic counterexamples[6] to those temporarily berthed vessels and to illustrate that nearly every watercraft can be theoretically made ready to sail. *See id.* Instead of reading the passage in context—as an exaggeration to illustrate a conceptual distinction—the court of appeals treated the passage as enunciating the standard for judgment as a matter of law.

But, if mere expectation that a ship will return to sea was enough to create a fact question on in-navigation status, the precedential value of countless major-overhaul cases would crumble. As Helix points out, major overhauls often occur with the precise goal of returning a ship to sea. *See, e.g.*, *West*, 361 U.S. at 122 (a ship was out-of-navigation as a matter of law despite being renovated for the purpose of returning her to sea). The *Stewart* Court made absolutely no indication that it intended such a sweeping limitation of the overhaul rule. In fact, *Stewart* did just the opposite; it reaffirmed *West*—the quintessential overhaul case. *See* 543 U.S. at 496 (citing *West*, 361 U.S. at 21, 23).

## C.    Status of the Watercraft Prior to Injury

The court of appeals correctly outlined Helix's burden of proof in this case: "Helix had to establish conclusively that the Helix 534 was not a vessel in navigation at the time of Gold's injuries." 482 S.W.3d at 650. But the court then appended a secondary burden by concluding, "Helix did not conclusively prove that the [534] was totally deactivated or out of service for an extended period of time before Gold's injury." *Id.* Helix argues that this secondary

---

[6] For instance, the Court noted also that "[a] ship long lodged in drydock or shipyard can again be put to sea, no less than one permanently moored to the shore or ocean floor can be cut loose and made to sail." *Stewart*, 543 U.S. at 498.

requirement—that the ship be deactivated for a significant time prior to injury—is improper because it makes Jones Act coverage depend on the timing of the plaintiff's injury, a factor that has no bearing on a vessel's in-navigation status.

Helix is correct. Whether an overhaul takes a vessel out of navigation is not decided by looking at the timing of the plaintiff's injury. The court of appeals cited no authority for its temporal prerequisite, and, indeed, none exists. For good reason: in an overhaul case, the in-navigation inquiry depends on the status of the ship and the extensiveness of the overhaul. *Chandris*, 515 U.S. at 374. If the project is extensive enough to take a vessel out of navigation, it matters not whether the claimant suffered his or her injury early or late in the process.

Additionally, the court of appeals' approach is in direct conflict with *Chandris*. There, Antonios Latsis, an engineer employed by Chandris, sailed aboard one of its vessels and suffered an eye injury. *Id.* at 350. Latsis remained onboard while the vessel underwent a six-month overhaul. *Id.* at 351. And Latsis remained onboard the now-seaworthy vessel after the project's completion. *Id.* at 350–51. The primary issue in the case was whether Latsis bore the right type of connection to the vessel to qualify as a seaman. *Id.* at 349–50.

But *Chandris* dealt also with an issue more relevant to the present case—whether the vessel was out of navigation during the overhaul. *Id.* at 372–73. The Court explained the import of that in-navigation determination on the general applicability of the Jones Act: "Of course, any time Latsis spent with the [ship] while the ship was out of navigation could not count as time spent at sea for purposes of that inquiry." *Id.* at 373. The Court remanded for further development of the record but maintained that, upon a conclusive record, "it is possible that Chandris could be entitled to partial

18

summary judgment or a directed verdict concerning whether the [ship] remained in navigation" during the renovation. *Id.* at 375.

The Court's in-navigation discussion is telling; the analysis had nothing to do with the timing of Latsis' injury. Nor did the *Chandris* renovation begin an "extended period of time before [Latsis'] injury," as the court of appeals' analysis seems to require. *See* 482 S.W.3d at 650. Rather, Latsis worked aboard the vessel long before the conversion began, yet the Supreme Court left open the possibility for summary judgment all the same. *Chandris*, 515 U.S. at 375. The court of appeals' timing-of-the-injury prerequisite is thus incongruous with *Chandris*. We instead follow the Supreme Court's advice to examine the status of the ship and extent of the modification in determining whether the 534 exited navigation. *See id.* at 374.

### D.    Helix's Entitlement to Summary Judgment

Finally, we reach the dispositive question: was the 534 a "vessel in navigation" during the course of its conversion? We hold as a matter of law that she was not.

### 1.    The Summary-Judgment Evidence

First, as we must ask in any summary-judgment case, are there any relevant[7] factual disputes? The answer here is no. Helix submitted an affidavit from a corporate representative, Jason Shropshire, that outlines the physical characteristics of the 534, the extent and cost of the repairs, and the 534's ability (or lack thereof) to navigate during the course of Gold's time onboard. The 534 was laid up at the time of its purchase. Helix purchased the 534 for $85,000,000 and orchestrated the

---

[7] Gold's evidence concerning the subjective labels of "vessel" and "able bodied seaman," discussed previously, *supra* Section III.A, is irrelevant to the ultimate issue: whether the 534's overhaul took her out of navigation.

watercraft's conversion from a drill-ship to a well-intervention ship. That task was so extensive that it required the 534 be turned over to contractors (though Helix assisted in the more minor repairs) at the Jurong shipyard. The conversion lasted 20 months and cost $115,000,000. And finally, the conversion rendered the 534 unable to navigate on her own—she needed the assistance of tugs or tows to move on the water—during the entirety of Gold's time onboard.

The deposition testimony of Gold does not call into question any of the objective characteristics of the 534 established above. In fact, Gold's testimony reaffirms that the 534's engines were inoperable and that the ship lacked the ability to self-propel during his time onboard. As a result, Helix's evidence pertaining to "the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done" went unrebutted. *West*, 361 U.S. at 122.

For comparative purposes, this case is unlike *Chandris* post-remand. After the Supreme Court remanded for the district court to consider a more developed record, the parties offered divergent evidence concerning the status of the vessel. *See Latsis v. Chandris*, No. 91 Civ. 6900(LAP), 1998 WL 458095, at *2 (S.D.N.Y. Aug. 4, 1998). The owner testified that the engines were inoperable during the entire conversion. *Id.* But the claimant testified that the repairs proceeded on each engine separately such that the ship maintained its propulsive capabilities. *Id.* The conflicting testimony on a material issue thus created a quintessential jury question. The record before us today is instead like the one in *Stewart*, in which the Court observed that "here no relevant facts were in dispute" before ruling on the vessel-in-navigation question as a matter of law. 543 U.S. at 496.

20

Consequently, we hold that Helix conclusively established the above matters concerning the 534 and the extent of her conversion, leaving this Court—as a decider of questions of law—to apply the relevant admiralty framework and determine whether the 534's conversion took her out of navigation.

### 2. Was the 534 a "Vessel In Navigation"

Our reading of the overhaul jurisprudence indicates that the 534's conversion places her decidedly in the category of ships rendered out of navigation. Again, the yardstick for our analysis is "status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done." *West*, 361 U.S. at 122. The distinction lies between routine, transitory repairs incurred in the ordinary course of a seagoing vessel and overhauls more properly characterized as land-based endeavors.

The Supreme Court and others have utilized various considerations for evaluating the extensiveness of any conversion: (a) the significance of the work performed; (b) the cost of conversion relative to the value of the ship; (c) whether contractors exercised control over the work; (d) the duration of the repairs; and (e) whether the repairs took the ship out of service. *See, e.g.*, *id.*; *Stewart*, 543 U.S. at 496; *Newsom v. Jantran, Inc.*, NO: 2:12-CV-150-M-V, 2013 WL 12178166, at *1 (N.D. Miss. Dec. 9, 2013). And, of course, *Stewart* tells us that the overhaul must be one that renders the ship practically incapable of transportation. *See* 543 U.S. at 496.

The Supreme Court has not elaborated on how precisely these cogs fit together. Nor need we for the purposes of this case; all of the relevant considerations indicate that the 534 was not a vessel in navigation during Gold's employment.

21

The work performed on the 534 was significant. Not only did the propulsive equipment and other components require repair or replacement, but the ship was purchased with the express goal of conversion. A change in the function of the ship—from a drill-ship to a well-intervention ship—required the addition of new equipment and removal of obsolete equipment. In terms of *West*, no one could seriously suggest that the work performed on the 534 was merely routine "ship's work." 361 U.S. at 122; *see also Stewart*, 543 U.S. at 494 (characterizing temporary, minor repairs as those that do not take a vessel out of navigation). Indeed, this was not the type of work that Helix could complete on its own. A majority of the construction work took place at the hands of outside contractors at the Jurong Shipyard. *See West*, 361 U.S. at 122 (gauging the extent of repairs by the necessity to turn over a ship to the hands of contractors). The 20-month duration and $115,000,000 cost of the overhaul likewise demonstrate its extent.

Moreover, the 534 was out of service for the entire duration of the overhaul. In fact, the 534 was laid up, taken out of the water, at the time Helix purchased her. Helix immediately began converting the craft to a well-intervention ship, and the 534 did not enter service until after her transformation. The status of the 534 before and after the conversion illustrates that Helix did not incur this construction project in the ordinary course of putting the 534 to a seagoing use. *Cf. Romero*, 307 F. App'x at 851 (finding a vessel briefly dry-docked for routine repairs to be in navigation).

These undisputed facts bear a close resemblance to *McKinley*, a Ninth Circuit case the Supreme Court cited with approval. *See Chandris*, 515 U.S. at 374 (citing *McKinley*, 980 F.2d at 567). In *McKinley*, All Alaskan converted an oil-drill ship into a seagoing fish-and-crab-processing

22

ship. 980 F.2d at 568. Similar to the work performed on the 534, the *McKinley* conversion was extensive, costly, performed mostly by contractors, and lasted 17 months. *Id.* at 568–69. The Ninth Circuit held as a matter of law that the converted ship was not in navigation while undergoing construction. *Id.* at 572.

The court of appeals, however, distinguished the 534's conversion from *McKinley* in two ways. First, the court observed that the ratio between conversion cost and purchase price in *McKinley* (33:1) was significantly more than that of the 534 (1.35:1). 482 S.W.3d at 649. And second, the court noted that in *McKinley*, the vessel owner converted a drill ship into a seafood-processing ship—an entirely different function. *Id.* (citing *McKinley*, 980 F.2d at 568). Here, however, the 534 would retain "its drilling capabilities and would appear as it always had." *Id.* The 534's conversion, the court then concluded, "could be characterized more as an upgrade compared to the project in *McKinley*." *Id.*

Boiled down to its essence, the court observed that the 534's conversion was less extensive than the one at issue in *McKinley*. True enough. But treating every aspect of *McKinley* as a prerequisite to out-of-navigation status misunderstands the Supreme Court's test. The difference between routine repairs and major overhauls that take vessels out of navigation is inherently one of "degree." *Chandris*, 515 U.S. at 374. Naturally then, the out-of-navigation cases that qualify for judgment as a matter of law will likewise vary in degree—no two overhauls will ever be identical. One can always conceive of a bigger, more extensive conversion than the one at hand, but that is no reason to withhold summary judgment in a case falling clearly on the major-overhaul side of the spectrum.

23

And in any event, the Supreme Court has sanctioned summary judgment in a case with a less extensive conversion than the one we face today. In *Chandris*, the Court explained that "it is possible" that a vessel owner could receive summary judgment as to a six month overhaul upon conclusive proof of significant modifications. *Id.* Thus, the Supreme Court does not treat every facet of *McKinley* (or any other case for that matter) as a prerequisite for summary judgment. Neither should we.

What's more is that *Chandris* belies the court of appeals' complete-conversion-versus-upgrade distinction. In *Chandris*, the ship did not undergo a conversion in functionality at all. *See id.* Consequently, the *Chandris* overhaul too could be considered a mere "upgrade," yet the Supreme Court did not foreclose summary judgment.

Finally, and perhaps most importantly in light of *Stewart*, the 534's conversion rendered the ship practically incapable of transportation for months—throughout the entirety of Gold's time onboard. We cannot give a comprehensive definition for the Supreme Court's "practically incapable of transportation" standard. But, in light of *Stewart*'s reaffirmation of *West,* we at least can say with confidence that a major overhaul that renders a ship unable to self-navigate qualifies for out-of-navigation status. Just like the overhaul in *West*, the renovation of the 534 rendered her unable to self-navigate. *See* 361 U.S. at 122. On those facts, summary judgment may lie. *See id.* (holding the ship out of navigation as a matter of law).

In summary, all of the Supreme Court's indicators of the extensiveness of the overhaul reveal that the 534's conversion warrants out-of-navigation treatment as a matter of law. So too does the 534's conversion warrant out-of-navigation treatment under *Stewart*'s capability-of-transportation

24

standard. All in all, because Gold must have had a substantial connection to a vessel in navigation, and because he had no vessel in navigation upon which to connect, Gold is not a Jones Act seaman in this lawsuit.

### 3. Response to the Dissent

The dissent concludes: "[T]he summary judgment evidence establishes the 534 was not practically capable of engaging in transportation at least from the time Gold began working on the ship in December 2012 until the time he last worked aboard the ship in April 2013"—a period of almost five months. *Post* at ___. That is precisely how we view the evidence: Helix proved conclusively that an overhaul rendered the 534 practically incapable of navigation during Gold's entire time onboard. We therefore disagree not about whether certain evidence is conclusive, but about whether certain conclusive proof satisfies the threshold for summary judgment.

The dissent acknowledges that the overarching in-navigation question hinges on a ship's practical ability to engage in maritime transportation. *Post* at ___. And the dissent recognizes that Helix proved such inability during Gold's time onboard the 534. Yet the dissent would withhold summary judgment because conclusive proof for this length of time is not proof for a sufficiently "extended period[] of time" to remove a vessel from navigation as a matter of law. *Post* at ___ (quoting *Stewart*, 543 U.S. at 496) (internal quotations omitted). Instead, the dissent suggests we must evaluate the ability of the 534 to self-navigate for some longer, yet undefined "relevant time period" extending before and after Gold's time aboard the ship. *Post* at ____. To do otherwise, the dissent says, would constitute an improper "snapshot" analysis. *Post* at ____. We disagree on both counts.

First, by implying that nearly five months is not a sufficiently "extended period of time" the dissent's approach effectively elevates the duration of the overhaul (and an inability to self-navigate) to the status of a precondition. Yet no such rule exists. The most the dissent can do is cite *Chandris* for the proposition that six months of repair work "seems to be a relatively short period of time for important repairs on oceangoing vessels." 515 U.S. at 374. But the *Chandris* Court simultaneously left open the possibility of summary judgment for a six-month renovation upon a more developed record. *Id.* at 375. *Chandris* thus presents no independent, time-based hurdle to summary judgment.

Nor does *Butler v. Whiteman* (another case cited by the dissent) support a temporal threshold. 356 U.S. 271, 271 (1958) (per curiam). We know very little of the details surrounding the Supreme Court's 1958 per curiam opinion. Though Justice Harlan explained in dissent that the "tug had been withdrawn from navigation because it was inoperable" for at least nine months, he gave no further indication of the work performed (if any) on the watercraft, or whether it had been withdrawn from navigation for minor repairs or for a more extensive conversion process. *Id.* at 272 (Harlan, J., dissenting). *Butler* does not explain why the majority identified a jury question, and it does not contain any sweeping rule of law that forecloses summary judgment for conversions lasting less than nine months. After all, if *Butler* created a nine-month threshold, why would the *Chandris* Court have left open the possibility of summary judgment for a shorter, six-month repair?

To be sure, the duration of an overhaul (and a ship's corresponding inability to navigate) is a helpful proxy—one of many considerations—for evaluating the overhaul's extent. *See Newsom*, 2013 WL 12178166, at *1 (listing the duration of repairs as one of six factors). But when we are faced with conclusive proof of a nonroutine, major overhaul, *West*, 361 U.S. at 122, that renders a

26

ship practically incapable of transportation, *Stewart*, 543 U.S. at 496, it matters not whether the ship's inability to navigate lasted five months, or six months, or a few years. Not only do we have no precedential basis for saying otherwise, any limit we might impose would be inherently arbitrary.

Second, the dissent suggests that our choice to focus on the period of Gold's onboard employment is inappropriate under the Supreme Court's repudiation of a "snapshot" test. The dissent claims instead that we should evaluate some other, more expansive "relevant period" for the 534's capacity for transportation. We would then find, the dissent says, that Helix failed to prove that the ship lacked propulsion during an extended period before and after Gold came onboard. Ultimately, the dissent's approach misunderstands the "snapshot" dilemma.

Acknowledged first in *Chandris*, the Supreme Court rejected the validity of a "snapshot" test when evaluating the type of "activity in which a maritime worker was engaged while injured." 515 U.S. at 362–63. But what is a snapshot? The Court clarified that seaman status must not be evaluated by "inspecting only the situation as it exists at the *instant of injury*; a more enduring relationship is contemplated in the jurisprudence." *Id.* (emphasis added and quotations and citations omitted). If a court were to take such a snapshot, it would allow "a worker [to] oscillate back and forth between Jones Act coverage and other remedies depending on" the worker's particular activity. *Id.* The Court rejected a snapshot analysis again in *Stewart*—this time in the context of the in-navigation inquiry. 543 U.S. at 495–96. The Court emphasized the principle that a "watercraft need not be in motion to qualify as a vessel" and observed, "a watercraft [does not] pass in and out of Jones Act coverage depending on whether it was moving at the *time of the accident*." *Id.* at 495–96 (emphasis added and quotations and citations omitted).

Our analysis of Gold and the 534 presents no conceivable snapshot dilemma.  As a matter of plain English, it is hard to imagine how observing the 534's status throughout the entirety of Gold's purported Jones Act connection—almost 5 months—can fairly be considered a "snapshot." And fortunately, there is no need to ponder the term's meaning; the Supreme Court made explicit that the type of prohibited snapshot is one that focuses on the "instant of injury," *Chandris*, 515 U.S. at 363, or the "time of the accident," *Stewart*, 543 U.S. 495–96.  When courts look with tunnel vision to the day of the injury, they risk mischaracterizing the status of an otherwise seaworthy ship.  Our analysis does no such thing; we evaluate the extensiveness of the renovation as a whole[8] and the status of the 534 during Gold's entire time onboard, not just on the day (or days) of his injury.  We do not cherry-pick a point in time that does not adequately characterize the true status of the ship; the 534 remained stagnant—incapable of self-transit—throughout the entire time Gold claims Jones Act coverage.

Snapshots aside, no case supports the dissent's contention that we must require conclusive proof of incapacity for transportation throughout some relevant time before and after the claimant's connection to the ship.  Instead, *Chandris* tells a different story.  There the Court explained that the connection between a seaman and the vessel in navigation must be "substantial in terms of its duration and its nature."  515 U.S. at 368.  The Court said also that "any time [the claimant] spent with the [ship] while the ship was out of navigation could not count as time spent at sea for purposes of that inquiry."  *Id.* at 373.  We conclude (and the dissent recognizes) simply that the 534 was

---

[8] Of course, the remainder of the project is material to our analysis—the 534's entire 20-month overhaul informs our evaluation of the conversion's extensiveness and solidifies the conclusion that the project is among those "complete overhaul[s]" worthy of out-of-navigation treatment. *See West*, 361 U.S. at 122.

practically capable of maritime transportation for *no time* during which Gold could claim a Jones Act connection to the ship.  That proof meets the threshold for summary judgment.

## V. Conclusion

Admiralty law is not always a model of clarity—the Jones Act is no exception.  Yet we can nevertheless discern one rule of law with confidence: major overhauls that render watercraft practically incapable of transportation are sufficient to remove those crafts from "vessel in navigation" status.  As the Supreme Court has said time and again, analyzing that issue will often involve fact questions worthy of jury consideration.  But here, absent any such disputes about relevant facts, and faced with conclusive proof above and beyond the threshold for summary judgment, we hold as a matter of law that the 534 was not in navigation and therefore that the Jones Act did not apply during the course of Gold's employment.

Because the court of appeals held otherwise, we reverse, and we reinstate the trial court's summary judgment in favor of Helix.

_____
John P. Devine
Justice

**OPINION DELIVERED**: June 16, 2017